**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Randy L. REIS, Defendant–Appellant.**

No. 89–2530.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1990.

Decided July 3, 1990.

---

# 286

Susan M. Knepel, Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

David E. Lowe, Hachey & Lowe, Milwaukee, Wis., for defendant-appellant.

Before POSNER, EASTERBROOK, Circuit Judges, and MOODY, District Judge.[*]

MOODY, District Judge.

Defendant Randy L. Reis appeals his conviction on one count of possession of ammunition by a felon, and two counts of possession of a firearm by a felon, all in

* Hon. James T. Moody, of the Northern District

violation of 18 U.S.C. § 922(g)(1). Specifically, Reis challenges the district court's denial of his pretrial motion to suppress and the denial of his postconviction motion for a judgment of acquittal. We affirm.

## I.

### The Motion to Suppress

On the afternoon of March 7, 1989, Milwaukee County Sheriff Detectives Richard Blakney and John Hepp were on duty in an unmarked police car, driving on Green Bay Avenue in Milwaukee, Wisconsin, when they pulled up at a stoplight next to a white Dodge Diplomat automobile. Because the Dodge Diplomat had two spotlights attached to it, one on each side of the windshield, and because it was similar to the unmarked police cars used by the City of Milwaukee, the detectives assumed the driver of that car was a police officer working a "special" (i.e., undercover) assignment.

When the light changed, the detectives proceeded forward onto Interstate 43. Once on the freeway, Detective Blakney, who was driving, noticed the Dodge Diplomat was following only two car lengths behind him. Blakney, thinking perhaps the driver wanted to pass him, changed lanes several times. The Dodge Diplomat, however, remained on the detectives' tail, mimicking each of their lane changes and maintaining a distance of only two car lengths behind them.

Blakney, somewhat aggravated, told Hepp that he was going to see what that other driver was up to. They were driving in the right hand lane at the time, and Blakney suddenly veered onto an entrance ramp and hit his brakes. The Dodge Diplomat passed on by. Blakney accelerated and caught up with the Dodge Diplomat, at which point the Dodge Diplomat pulled over into an emergency lane and stopped. The detectives pulled up behind the Dodge Diplomat.

Defendant Reis, who was driving the Dodge Diplomat, placed a "fireball" (a rotating red light of the sort used by police

of Indiana, sitting by designation.

officers) on the dashboard of his car and activated it. Reis then stepped out of his car and, in an aggressive and assertive manner, approached Detective Hepp, who had by then gotten out of the other car. According to Hepp's testimony, the following exchange occurred between the two:

Reis: What's your problem?

Detective Hepp: Well, I'm not the driver of the vehicle, but the driver does not appreciate the fact that you are tailgating him so.

Reis: I wasn't tailgating you. You guys made an illegal turn off of Capitol Drive and you're speeding.

Detective Hepp: Who are you?

Reis: Who the fuck are you?

Detective Hepp: Sheriff's Department.

Reis: Show me your identification.

As Hepp reached into his pocket to produce his badge, he ordered Reis to show his own identification.

Upon seeing Hepp's detective's badge and identification, Reis wilted, lost his assertive and aggressive manner, and meekly replied "I'm nobody." He produced his driver's license and, in response to questions from Hepp about the fireball, he stated that he needed it for his work as a private security officer. Hepp walked Reis back to his car. When Reis got in and deactivated the fireball, Hepp looked into the car and saw a billy club with a side handle sticking out from between the seats and, in a holder on the door, a black "mag" flashlight of a type typically used by police officers. Hepp returned to his car, and after running a license check on the car and on Reis (which disclosed no outstanding warrants and also disclosed that Reis was not the registered owner of the car), the officers allowed Reis to leave.

Later that same day, Hepp telephoned assistant district attorney George Prietz and talked to him about the incident. Hepp was troubled, and wondered if Reis was violating the law by possessing the items Hepp had seen in the car. Prietz told Hepp to have Reis come to the district attorney's office the next morning at 9:00, and said that they could arrest Reis for disorderly conduct or for carrying a concealed weap-

on. Prietz said he would "take it from there regarding the impersonation of a police officer."

Hepp called Reis' home and, when no one answered, he called Reis' employer and left a message for Reis to come to the District Attorney's office at 9:00 the next morning.

The next morning when 9:00 came and Reis did not appear, Hepp telephoned Reis' home. Reis said he had worked late and overslept. According to Reis, he was given the message at work to appear the next morning but was never told to come at any particular time. Hepp told Reis that he and Detective Blakney would come over to Reis' house to talk to him about the incident of the previous day.

The detectives arrived at the house about 9:40 a.m., and noticed the Dodge Diplomat parked in the street in front of the house. Reis came out of the house and agreed to talk to the detectives in their car. He got into the back seat, with Blakney and Hepp in the front. Blakney advised Reis of his constitutional rights, and Reis indicated he understood his rights and would answer their questions.

The detectives questioned him for about ten minutes, asking about his job, his uniform, the items in his car, and whether he had ever used the fireball before when off duty. After about ten minutes of questioning, Blakney asked Reis if he could search Reis' car. At this point Reis became agitated, said he was terminating the interview, and got out of the police car. Both detectives also got out and told Reis he was under arrest. They patted him down, handcuffed him, and returned him to the police car.

Hepp then went up to the house and conversed briefly with Reis' parents, who were upset after having observed their son's arrest. When Hepp returned to the car a few minutes later, the detectives again asked permission to search the car, telling Reis that the car would be towed and impounded even without his permission, and that the car and its contents would be kept for evidence. Hepp also told Reis truthfully that Reis' father said he

wanted to consent to a search of the car. Reis testified that he finally gave his consent because he felt he had no other choice.

When they searched the car, the detectives found, among other things, a .38 caliber Colt Diamondback revolver. This revolver, which had been in a brown paper bag in the glove compartment, led to Reis' indictment on a charge of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).[1]

Reis filed a motion to suppress all evidence obtained as a result of the search of the automobile described above. He asserted as grounds: (1) that there was no probable cause for his arrest; (2) that there was no probable cause to search the automobile; and (3) that his consent to search the automobile was not voluntarily given. After an evidentiary hearing on the matter, the magistrate issued a Magistrate's Recommendation in which he: (1) found there was probable cause to arrest Reis on a charge of impersonating a police officer; (2) found there was no probable cause to arrest him on charges of disorderly conduct or carrying a concealed weapon; (3) recommended the motion to suppress the physical evidence seized from Reis' car on March 8, 1989, be granted; and (4) recommended that the motion to suppress the fruits of the search be denied.

The government and Reis each filed objections to the portions of the recommendation that were unfavorable to their respective positions. The district court, in a thoughtful and well-reasoned order, agreed with the magistrate's findings on the existence of probable cause for arrest, but rejected the recommendation that the evidence seized from the car be suppressed. The court determined that probable cause existed to search the car, and that the automobile exception to the warrant requirement made a search warrant unnecessary. The court, therefore, denied the motion to suppress in its entirety.

On appeal, Reis argues that the district court erred in finding there was probable cause to arrest him for impersonating an officer and in refusing to suppress the evidence seized from the automobile. The government, on the other hand, challenges the finding that there was no probable cause to arrest Reis for disorderly conduct.

### (1) *Probable Cause for Arrest*

■ In reviewing the lower court's denial of defendant Reis' motion to suppress, "this court must rely on the district court's factual findings unless they are clearly erroneous," *United States v. Lima*, 819 F.2d 687, 688 (7th Cir.1987), but must determine the existence of probable cause *de novo*. *Id.* The standard for determining the existence of probable cause, of course, is well-established:

> The police have probable cause to arrest an individual where "the facts and circumstances within their knowledge of which they have trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense."

*United States v. deSoto*, 885 F.2d 354, 367 (7th Cir.1989); *United States v. Goudy*, 792 F.2d 664, 668 (7th Cir.1986); *United States v. Covelli*, 738 F.2d 847, 853 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984); *see also United States v. Lima*, 819 F.2d at 688.

■ According to the evidence presented at the suppression hearing and the factual findings subsequently made by the magistrate and adopted by the district court, the detectives had ample reason to believe Reis had violated Wis.Stat. ¶ 946.70(1), which makes it a crime to "impersonate a peace officer with intent to mislead others into believing that the person is actually a police officer." Although Reis can hardly be punished for driving an automobile that resembles an unmarked police car, the fact that he placed the fireball on his dashboard and activated it when he stopped, coupled with the fact that he then got out of his car, approached Hepp in an aggressive and

---

**1.** Reis had a prior felony conviction for selling firearms without keeping the records required by law.

assertive manner, and told Hepp that the detectives had made an illegal turn and were speeding, is more than sufficient to warrant Hepp in believing Reis was trying to convince Hepp he was a police officer.

■ Reis, however, claims that the detectives must not have believed at the time that he had committed a crime because they did not arrest him until the next day, therefore casting doubt on the existence of probable cause. This argument has two flaws. First, there is no requirement that an offender be arrested the moment probable cause is established. *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374, 386 (1966). The overnight delay simply has no bearing on the existence of probable cause for arrest. Second, the existence of probable cause is judged by an objective standard: whether the facts known to the arresting officer would warrant a prudent person in believing a crime had been or was being committed. If the police officer has knowledge of sufficient facts to establish probable cause, but merely wishes to consult an attorney about the law before making an arrest as the detectives did here, the officer's initial uncertainty about the law does not somehow eliminate the factual basis establishing probable cause.

■ Reis also argues that he never even noticed the detectives and their car until they suddenly slowed down in front of him and pulled onto the entrance ramp, causing him to have to slam on his own brakes and swerve to avoid a collision. According to Reis, when he subsequently noticed that same car accelerating to catch up with him, he pulled off the road to avoid any further danger to himself, only to discover the car had pulled off the road right behind him. He states that he determined it was best under the circumstances to try to scare the unknown individuals into leaving him alone, and that is why he took the actions for which he was later arrested. He cites to *State v. Brown*, 107 Wis.2d 44, 318 N.W.2d 370 (1982), to support his claim that if his violation of the law was necessary to defend himself from a perceived danger by police officers whose identities were unknown to him at the time, he could not be arrested and charged for those acts.

In *Brown*, the defendant, who had been charged with speeding, claimed he exceeded the speed limit because it was the only way he could think of to get away from another driver on the highway who had been driving in a wild and erratic manner, so that he feared a physical confrontation. The "harasser," as it turned out, was a police officer in an unmarked car. The Supreme Court of Wisconsin recognized the right of Brown to claim self-defense under such circumstances, holding that "where a violation of [the strict liability speeding statute] occurs, the actor may claim a defense of legal justification if the conduct of a law enforcement officer causes the actor reasonably to believe that violating the law is the only means of preventing bodily harm to the actor or another and causes the actor to violate the law." *State v. Brown*, 107 Wis.2d at 55, 318 N.W.2d at 376.

■ However, as the government points out, a defense based on the offender's perception of the circumstances is not sufficient to defeat probable cause, because probable cause is based on what is known to the arresting officer at the time, not what goes on in the offender's mind. In this case, the facts found by the lower court, which we do not find to be clearly erroneous, indicate the information known to the detectives would not have supported the application of the *Brown* defense.

Furthermore, even if the detectives had seen everything from Reis' point of view, *Brown* still would be inapplicable. First of all, *Brown* requires that the offender reasonably believe he is in danger of bodily harm. In this case, however, the only time any apparent danger to Reis occurred was when the detectives in front of him braked suddenly and pulled onto an entrance ramp, requiring Reis to brake and swerve around them (according to Reis). Any danger that may have resulted from this was caused, at least in part, by Reis himself, through his tailgating of the detectives. There was no evidence that the detectives tried to repeat this maneuver, or that they took any other

actions, such as following dangerously close to Reis, that threatened harm to him. They merely returned to the traveling lane and began accelerating to catch up with him, and he pulled over before anything else occurred. The evidence simply does not establish sufficient reason for Reis reasonably to fear he would be in grave danger if he did not pull over and pretend to be a police officer.

Additionally, *Brown* requires the offender reasonably to believe violating the law is the *only* way to prevent bodily harm to himself. Even if Reis did have a legitimate reason to fear for his safety, getting out of his car and approaching the "harasser" in an aggressive manner can hardly be a reasonable way to avoid bodily injury from someone who, for no apparent reason, threatened him. The option of remaining in the car with his windows rolled up, honking his horn and flashing his lights to attract attention of passers-by if necessary, or even driving away quickly after the "harasser" got out of his own car, are all options that are not only legal, but would seem to be far less likely to result in a violent physical confrontation than the course of action Reis took. In sum, we find Reis' arguments to be without merit, and therefore agree with the district court's conclusion that probable cause existed for Reis' arrest on charges of impersonating an officer. Because we find his arrest was proper on this ground, we need not address the state's claim that there was also probable cause to arrest on charges of disorderly conduct.

### (2) The Search of the Car

■ Reis argues that the detectives violated his Fourth Amendment rights when they searched his car [2] without a warrant, and that the district court therefore erred when it found the "automobile exception" to the warrant requirement to apply.[3]

■ The automobile exception allows vehicles that are being used on the highway or are readily capable of such use to be searched without a warrant "so long as the overriding standard of probable cause is met." *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406, 414 (1985). The reasons underlying the exception are twofold: The reduced expectation of privacy an individual has in a car, and the "exigencies attendant to ready mobility" of the vehicle combine to create a situation justifying a search without taking the time to obtain the prior approval of a magistrate. *Id.*, 471 U.S. at 392–93, 105 S.Ct. at 207, 85 L.Ed.2d at 414; *United States v. Rivera*, 825 F.2d 152, 158 (7th Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987).

Reis, however, points out that the Supreme Court stated in *Carney* that the automobile exception is applicable "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and *is found stationary in a place not regularly used for residential purposes.*" *California v. Carney*, 471 U.S. at 392, 105 S.Ct. at 2070, 85 L.Ed.2d at 414 (emphasis added). Reis argues that because his car was in a place that is regularly used for residential purposes, the above-quoted language from *Carney* renders the automobile exception inapplicable, unless exigent circumstances can be shown to exist.

Reis misconstrues the meaning of *Carney*. In that case, the Supreme Court was faced with the issue of whether a mobile home comes within the automobile exception, and the Court looked to the location where the vehicle was parked solely for the purpose of determining whether the mobile home was being used more like an automobile (so that it would come within the exception) or more like a residence (so that a heightened expectation of privacy would exist, necessitating either a warrant or the existence of exigent circumstances before a search properly could be carried out). *Carney* does not establish a requirement that additional exigent circumstances be present

---

**2.** Although the automobile was not registered to Reis, there is no dispute that it was legally in his possession.

**3.** There is no issue of the search having been justified by a valid consent—the government concedes, whether wisely or unwisely we do not say, that Reis' consent was not voluntary.

merely because an automobile is parked at a residence.

◼ Indeed, this circuit and others have, either expressly or implicitly, construed *Carney* as recognizing that the inherent mobility of automobiles by itself provides the only exigent circumstance needed, so that as long as probable cause exists to search an automobile, that automobile may be searched without a warrant. *See e.g., United States v. Paulino,* 850 F.2d 93, 96 (2d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989); *United States v. Markham,* 844 F.2d 366, 369 (6th Cir.1988); *United States v. Rivera,* 825 F.2d at 158; *Autoworld Speciality Cars, Inc. v. United States,* 815 F.2d 385, 389 (6th Cir.1987); *United States v. Bagley,* 772 F.2d 482, 490–91 (9th Cir. 1985), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986). Even in circuits which construe *Carney* as imposing a requirement that additional exigent circumstances be demonstrated before the automobile exception is applicable, *see, e.g., United States v. Alexander,* 835 F.2d 1406, 1409–10 (11th Cir.1988); *United States v. Hepperle,* 810 F.2d 836, 840 (8th Cir.), *cert. denied,* 483 U.S. 1025, 107 S.Ct. 3274, 97 L.Ed.2d 772 (1987), circumstances such as those found in this case—the car parked outside the arrestee's residence, with the possibility of either the registered owner or family members of the arrestee removing the car or destroying evidence in the car before a warrant could be obtained—have been found to constitute exigent circumstances sufficient to activate the automobile exception. *See, e.g., United States v. Alexander,* 835 F.2d at 1410. Furthermore, the fact that the detectives could have obtained a warrant in the hours between the initial encounter on the freeway and the arrest, but did not, does not change this analysis. "Clearly, the *Carney* majority ... did not contemplate that an agent's inability to obtain a search warrant be a prerequisite to the application to the automobile exception." *United States v. Markham,* 844 F.2d at 369.

In sum, probable cause to search the car existed, based on the detective's observation of the fireball and other police-related paraphernalia in the car, and the car was a vehicle that was readily capable of use upon the highway. The district court did not err in finding the automobile exception to apply.

## II.

### The Motion for Acquittal

◼ After a two day trial, a jury found Reis guilty on Count One of the superseding indictment, which charged him with possession of ammunition by a felon, and on Counts Four and Five,[4] which charged him with possession of a firearm by a felon. The jury, however, turned in a verdict of not guilty on Count Two, which also charged possession of a firearm by a felon.

In his Motion for Judgment of Acquittal after Discharge of Jury filed pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, Reis had asked the court to acquit him on Count Five, which related to the Colt Diamondback Revolver found in the glove compartment of his car, because, he asserted, the evidence was so scant that the jury could only speculate as to his guilt on that count. He pointed out that a government witness named John Wells had testified that he sold Reis the weapons at issue in both Counts Two and Five, and Reis claimed that because the jury acquitted him on Count Two, it must not have found any of Wells' testimony to be credible, including that relating to the weapon in Count Five. Reis also pointed out that the jury had sent out a note asking about the circumstances surrounding the search of Reis' car, arguably indicating they were confused about Count Five.

The court denied the motion for acquittal, and Reis now appeals that denial.

In reviewing a decision on a Rule 29(c) motion challenging the sufficiency of the evidence,

---

**4.** The government dismissed Count Three prior to trial, and the court ordered Counts Four and Five to be renumbered as Three and Four in the copy of the indictment that went to the jury. We will use the original number designations—Four and Five—when referring to these counts in this opinion.

"[T]he test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government ... bear[ing] in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences.'"

*United States v. Reed,* 875 F.2d 107, 111 (7th Cir.1989) (quoting *United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir. 1986)).

Applying the test in this case, we note that the jury heard evidence that the weapon at issue in Count Five was found in the car Reis had been driving, and also that Wells, while claiming to have sold that gun to Elite Security, actually turned the gun over to Reis himself. Taken in conjunction with Reis' prior felony conviction, this is ample evidence to support the verdict in Count Five.

 To the extent Reis claims that the verdict in Count Five is inconsistent with the jury's verdict in Count Two and that such inconsistency requires his conviction on Count Five to be reversed, we remind him that "[i]t is well-settled ... that [c]onsistency in the verdict is not necessary. Each Count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358–59 (1932); *United States v. Reed,* 875 F.2d at 110; *United States v. Abayomi,* 820 F.2d 902, 907 (7th Cir.), *cert. denied,* 484 U.S. 866, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987). Because it is just as likely that the jury exercised lenity with respect to Count Two, than that the jury improperly convicted him on Count Five, it would be error to reverse the conviction solely because of an apparent inconsistency. *See United States v.*

*Reed,* 875 F.2d at 111. Furthermore, even deciding if the verdicts were inconsistent in the first place would require the court to delve into matters of witness credibility—a task properly left in the hands of the jury. The fact that the jury may have disbelieved Wells' testimony about one transaction does not automatically mean they disbelieved his story about the second transaction.

As for Reis' claim that the jury's request for information on the circumstances surrounding the search of the car indicates uncertainty or confusion in deciding Count Five, we believe the note indicates nothing more than curiosity on issues not relevant to their decision.[5] The note, if anything, reveals the jurors did not disbelieve the evidence of the firearm being found in Reis' car, but only wondered if the police had obtained that evidence legally.

In sum, we find no error in the district court's denial of Reis' post-trial motion for acquittal on Count Five.

AFFIRMED.

---

**5.** The jury asked:
Why were the police observing him March 7 and stop him.
Why did the police come to his home March 8.
Did they have a search warrant for his car March 8.
Law about searching car!