UNITED STATES of America, Plaintiff,

v.

Sammie WESLEY, Defendant.

No. 95–CR–6050L.

United States District Court,
W.D. New York.

Feb. 28, 1996.

Charles F. Crimi, Jr., Rochester, NY, for defendant.

Richard Resnick, U.S. Attorney, Rochester, NY, for plaintiff.

## DECISION AND ORDER

LARIMER, Chief Judge.

Defendant, Sammie Wesley ("Wesley"), was indicted on September 6, 1995. The indictment contains two counts. Count I charges Wesley with knowingly making a false and fictitious written statement in connection with his purchase of a shotgun, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). The alleged false statement was Wesley's alleged representation on an ATF Form 4473 that he had not been convicted of a felony, when in fact he knew that he had. Count II charges defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

There are two motions pending before the Court: (1) Wesley's motion to suppress physical evidence, namely, a shotgun seized from his automobile by the police on July 31, 1993; and (2) Wesley's motion to dismiss Count II of the indictment.

## SUPPRESSION MOTION

The Court held a suppression hearing on December 6, 1995. The only witness who testified was Officer Michael C. Salway ("Salway") of the Rochester Police Department.

Salway, who had been a patrol officer with the Department for four years and served with the Monroe County Sheriff's Department in the jail for eighteen months, testified that he responded to an emergency 911 telephone call and interviewed Deborah Davis ("Davis"). Davis told Officer Salway that the defendant had been pursuing her romantically for some time but that she had refused his overtures. On this particular day, he had apparently asked her for a date and when she refused Wesley became angry. She told Salway that Wesley went to his automobile and retrieved a "long gun" from the back seat. According to Davis, Wesley confronted her with the gun, pointed it at her and said "get in the car, bitch, or I will kill you." At that point, a neighbor, apparently alarmed by the shouting, came out of her house to take her child indoors. At the same time, Davis ran screaming from the scene. Davis described the automobile as a maroon Cadillac with a molded spare tire carrier on the

trunk. At that point, Officer Salway radioed into the Department of Motor Vehicles and immediately determined that a maroon Cadillac was registered to Wesley. Salway testified that he knew Wesley to have a violent history and to be abusive. Wesley was an inmate at the Monroe County Jail when Salway was employed there as a deputy sheriff.

Salway described Davis as very upset, frightened and shaking while she related her complaint to him. Salway talked to Davis about filing charges and she indicated that she would go to the police department the next day to file charges for menacing.

Salway estimated that he talked with Davis for about ten minutes and, after he made sure that she was secure, proceeded to drive through the area in search of Wesley and the vehicle. After about five minutes, he observed defendant's vehicle parked on Harvest Street, which was only two or three blocks away from the point where Wesley confronted Davis. Salway radioed that he had located the car and eventually other officers arrived. The car was locked but Salway testified that he was able to look into the rear seat through the window at which time he observed what appeared to be a pistol-grip handle for a weapon. He then went to the other side of the car and saw what he observed to be a portion of the barrel as well. He had an instamatic camera and at some point took photographs of the back seat showing the condition of the weapon when he first observed it (Exs. 1, 2).

At this point, he called a supervising officer and a decision was made to seize the vehicle and the weapon as evidence used in the commission of a crime. A decision was made to tow the vehicle. Rochester Police Department procedures required that an inventory be conducted of the vehicle's contents. The tow truck operator opened the car and Salway retrieved the weapon, which turned out to be a loaded 12-gauge shotgun.

Salway conceded that there was discussion about obtaining a warrant, but he believed it was an "emergency situation" because they had discovered the vehicle soon after the confrontation between Wesley and Davis and because the officers did not know of Wesley's whereabouts, whether he had another weapon or whether he might be still pursuing Davis. Salway said that he was concerned about Davis' safety, the public safety and his own but was not specific as to what he thought might happen.

Apparently the vehicle was released a few days later to Wesley because Salway saw it in the neighborhood. The decision to release the vehicle had been made without Salway's knowledge. The shotgun, obviously, was not returned to Wesley.

Wesley was arrested without a warrant on September 21, 1993 for criminal possession of a weapon. Salway testified that he had difficulty locating Wesley. He had prepared a complaint but did not obtain a warrant until he had actually apprehended Wesley and taken him into custody.

Salway testified that had he found Wesley with the car or seen him on the day of the incident, he would have detained him and arrested him.

Salway checked with police headquarters prior to searching for the car to verify that Wesley did have a criminal record. Salway, of course, knew that Wesley had been incarcerated in the Monroe County Jail but did not know the nature or extent of Wesley's criminal record at the time he discovered the car and seized the weapon.

Wesley moves to suppress the shotgun on the ground that the warrantless search and seizure of the gun were unlawful. This motion is denied.

The facts of this case are similar to those in *United States v. Martin*, 806 F.2d 204 (8th Cir.1986). There, several agents executed a warrant to search the defendants' house for machine-gun and silencer parts. They seized some evidence, including diagrams for constructing a machine gun. Several hours later, one agent walked over to one defendant's truck, which was parked on a public street near the house. The agent looked through the window of the truck and saw machine-gun parts. He then opened the truck's door and seized the parts.

The district court granted the defendant's motion to suppress the items seized from the truck. In an opinion authored by Judge

Timbers of the Second Circuit (sitting by designation), the Court of Appeals reversed. The court held first that there was no "search" of the truck's interior because the agent had simply observed what would have been in plain view to any person who looked through the truck's window. *Id.* at 206–07. The court further held that the entry into the truck and the seizure of the gun parts were justifiable under the "automobile exception" to the Fourth Amendment's warrant requirement, because the agent had probable cause to believe that the items seized were evidence of a crime. *Id.* at 207–08.

■ The same result is called for in the case at bar. As the court stated in *Martin*, the initial observation of the shotgun in this case did not implicate the Fourth Amendment, because looking through a car's windows does not constitute a "search" for purposes of the Constitution.[1] Thus, Salway's "conduct was not a 'search' because a person who parks a car—which necessarily has transparent windows— ... does not have a reasonable expectation of privacy in the visible interior of his car." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir.1995), *petition for cert. filed*, (U.S. Jan. 17, 1996) (No. 95–7580). *See also Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) ("[t]here is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers") (citations omitted); *United States v. Ware*, 914 F.2d 997, 1000 (7th Cir.1990) ("there is no expectation of privacy and thus no 'search' when a person merely observes something through an automobile's window").

■ I also find that the warrantless seizure of the gun fell within the automobile exception, which allows "law enforcement officials [to] conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime." *United States v. Vassiliou*, 820 F.2d 28, 30 (2d Cir.1987). It is clear that Officer Salway had probable cause to believe that the gun was evidence of the commission of a crime. He had been informed by Davis that defendant had threatened her with what Davis described as a "long gun," and that defendant had gotten into his car with the gun and driven away. Shortly thereafter, he found the car a few blocks from Davis's house, and could see the handle and barrel of a shotgun through the window. There can be no doubt, then, that probable cause existed to believe that the car contained evidence of the crime of menacing. *See Hatten*, 68 F.3d at 261 ("[h]idden guns, even badly hidden guns, are by their nature incriminating"); *Vassiliou*, 820 F.2d at 30 (police had probable cause to search car for weapon based on witness's statement that defendant had brandished pistol and then concealed it in car); *United States v. Good*, 780 F.2d 773, 775 (9th Cir.) (officers' intrusion into vehicle to seize pistol that was in plain view did not violate defendant's Fourth Amendment rights, where officers knew that victim had been pistol-whipped, and thus gun's incriminating nature was apparent), *cert. denied*, 475 U.S. 1111, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986). Furthermore, as Salway testified, carrying a loaded gun in an automobile is illegal in New York State, *see* N.Y. Envtl. Conserv. L. § 11–0931(2), and the fact that defendant had threatened to kill Davis with it suggested that it could well have been loaded.

■ Moreover, the fact that the automobile was parked and unoccupied does not affect the applicability of the exception. For a vehicle to fall within the automobile exception, it is not necessary that it be occupied or moving at the time of the police officer's intrusion into the vehicle. What matters is whether it was movable. *Vassiliou*, 820 F.2d at 30. *See United States v. Harwood*, 998 F.2d 91, 96–97 (2d Cir.) (search of van at police command post several hours after it was seized was justified under automobile exception), *cert. denied*, —— U.S. ——, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993); *United*

---

1. Strictly speaking, therefore, the "plain view" doctrine does not apply to Salway's observation of the gun, since that doctrine is concerned with the seizure of items that come within an officer's view during a constitutionally permissible intrusion. *Martin*, 806 F.2d at 206–07; *see United States v. Delibac*, 925 F.2d 610, 613 (2d Cir. 1991).

*States v. Hatley,* 15 F.3d 856, 858–59 (9th Cir.1994) (automobile exception applied to inoperable car that appeared to be operable at time of search); *Martin,* 806 F.2d at 207 (truck parked on street fell within automobile exception because neither defendant was in custody, and truck was readily available for use).

In the case at bar, defendant's vehicle was parked on the street and could have been driven away at any time. Salway did not know defendant's whereabouts, and had no way of knowing whether or when defendant would return to the vehicle. *See California v. Carney,* 471 U.S. 386, 394, 105 S.Ct. 2066, 2070–71, 85 L.Ed.2d 406 (1985) (mobile home was subject to automobile exception where it was located "in a setting that objectively indicate[d] that the vehicle [wa]s being used for transportation").

 These circumstances also support a finding that the warrantless entry into the vehicle was supported by the existence of exigent circumstances. Although the Government presents this as an alternative to the automobile-exception theory, to some extent the two doctrines are intertwined, for it is the "exigent circumstances resulting from the automobile's inherent mobility that the Supreme Court has recognized as justifying the automobile exception to the warrant requirement." *Vassiliou,* 820 F.2d at 30 (holding that automobile exception applied notwithstanding fact that defendant's car was on military base, entry to and exit from which were controlled by military police, and therefore could not simply have been driven away). Thus, several circuits "have, either expressly or implicitly, construed *Carney* as recognizing that the inherent mobility of automobiles by itself provides the only exigent circumstance needed, so that as long as probable cause exists to search an automobile, that automobile may be searched without a warrant." *United States v. Reis,* 906 F.2d 284, 291 (7th Cir.1990). *See also United States v. Ludwig,* 10 F.3d 1523, 1528 (10th Cir.1993) ("If police have probable cause to search a car, they need not get a search warrant first even if they have time and opportunity"); *United States v. Panitz,* 907

F.2d 1267, 1272 (1st Cir.1990) ("the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle lawfully stopped in transit or parked in a public place, whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search"); *United States v. Paulino,* 850 F.2d 93, 96 (2d Cir. 1988) ("courts applying the automobile exception are concerned only with whether the search involves an automobile ... If the space searched meets this criteria then, provided probable cause exists, the inquiry ends"), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

Moreover, even if some additional factors are required to constitute exigent circumstances for a warrantless search of an automobile, circumstances such as those found here—the car parked on the street, with the possibility that the defendant could arrive at any time and drive it away or remove or destroy evidence in the car—have been found to constitute exigent circumstances. *Reis,* 906 F.2d at 291; *see also Cardwell v. Lewis,* 417 U.S. 583, 593, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325 (1974) (exigent circumstances found to exist even though police had defendant in custody at time they seized his car); *Pinkney v. Keane,* 920 F.2d 1090, 1099–1100 (2d Cir.1990) (exigent circumstances existed supporting warrantless search of car where defendant was lying in emergency room, temporarily immobilized by leg injury, and it was likely that, upon recovery, he would drive off), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991); *Ware,* 914 F.2d at 1000–01 (exigent circumstances existed permitting warrantless seizure of shotgun from car, where officer knew that attempted armed robbery had recently occurred and that other officer had pursued car to parking lot, whereupon car's occupants parked and walked away); *cf. United States v. Lasanta,* 978 F.2d 1300, 1305 (2d Cir.1992) (exigent circumstances did not exist where car was parked "not in a public thoroughfare," but in defendant's private driveway, and defendant, who was arrested prior to

seizure of car, was inside house, asleep, when officers arrived).[2]

### MOTION TO DISMISS COUNT II

Defendant moves to dismiss Count II of the indictment on the ground that 18 U.S.C. § 922(g)(1) is unconstitutional. Defendant asserts that Congress exceeded its authority under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, in enacting this statute because the acts prohibited by the statute—receiving and possessing a firearm that has moved in interstate commerce—have no relationship to interstate commerce.

Although it is not cited in his motion, defendant appears to be relying on *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Supreme Court held that the Gun–Free School Zones Act, 18 U.S.C. § 922(q), exceeded Congress's authority to legislate under the Commerce Clause. Section 922(q) made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." The Court based its holding on its conclusion that "[t]he Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1626.

Several Courts of Appeals have addressed the constitutionality of § 922(g)(1) in light of the *Lopez* decision, and they have uniformly held that it passes constitutional muster. In *United States v. Rankin*, 64 F.3d 338, 339 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 577, 133 L.Ed.2d 500 (1995), the Eighth Circuit held that unlike § 922(q), § 922(g)(1) "clearly is tied to interstate commerce ..." The Ninth Circuit has likewise held that "the statute is a valid exercise of Congress' commerce authority ..." *United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995). *See also United States v. Bell*, 70 F.3d 495, 498 (7th Cir.1995); *Unit-*

*ed States v. Johnson*, 55 F.3d 976, 979–80 (4th Cir.1995) (upholding constitutionality of § 922(g) under Commerce Clause, though not expressly addressing *Lopez*); *United States v. Bishop*, 66 F.3d 569, 575 (3d Cir.) (holding that carjacking statute with jurisdictional element similar to that in § 922(g) is constitutional), *cert. denied*, —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995). Many district courts have reached the same conclusion. *See United States v. Williams*, 893 F.Supp. 617, 621–22 (S.D.W.Va.1995); *United States v. Brown*, 893 F.Supp. 11, 12 (M.D.N.C.1995); *United States v. Campbell*, 891 F.Supp. 210, 212 (M.D.Pa.1995); *United States v. Taylor*, 897 F.Supp. 1500, 1503 (D.Conn.1995); *United States v. Edwards*, 894 F.Supp. 340, 342 (E.D.Wisc.1995); *United States v. Tripp*, No. 94 CR 0567, 1995 WL 417591 *3 (N.D.Ill. July 13, 1995); *United States v. Cole*, Crim. No. 89–322, 1995 WL 375833 *2 (E.D.Pa. June 16, 1995); *United States v. Hart*, 895 F.Supp. 189 (N.D.Ohio 1995).

■ The reason that *Lopez* does not require a finding that § 922(g)(1) is unconstitutional was in fact identified by the *Lopez* Court itself. The Supreme Court noted that in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), it had held that former 18 U.S.C. § 1202(a) (the predecessor statute to § 922(g)), which had an interstate-commerce element almost identical to that of § 922(g), required a showing of a nexus between the possession of the firearm and interstate commerce. The *Lopez* Court stated that "[u]nlike the statute in *Bass*, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

The requirement of § 922(g) that the defendant's possession of the firearm or ammunition must have been "in or affecting com-

---

2. *Lasanta* seems to call into question *Paulino*'s statement that the automobile exception requires only that probable cause existed and that the space searched was an automobile. *Lasanta*, 978 F.2d at 1306–07. The facts of *Lasanta* are clearly distinguishable from those in the case at

bar, however, and as stated, I find that additional exigent circumstances did exist here. *See Ludwig*, 10 F.3d at 1528 (distinguishing cases in which car is searched prior to defendant's arrest, when defendant could still drive car away, and those in which search occurs after arrest).

merce," then, supplies the critical element that rendered § 922(q) constitutionally infirm in *Lopez*. Prior to *Lopez*, concerning § 922(g) violations, it was well-established that this interstate-commerce element is an element of the offense that the Government must prove at trial. *Bass*, 404 U.S. at 350, 92 S.Ct. at 523; *United States v. Jones*, 16 F.3d 487, 491 (2d Cir.1994); *United States v. Carter*, 981 F.2d 645, 648 (2d Cir.1992), *cert. denied*, 507 U.S. 1023, 113 S.Ct. 1827, 123 L.Ed.2d 456 (1993).

Nothing in *Lopez*, then, calls into question the continuing validity of *Bass* or of *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), which held that the predecessor to § 922(g) satisfied the Commerce Clause because it required that the firearm had traveled in interstate commerce.[3] Applying *Scarborough*, the Second Circuit has held that § 922(g)(1) is constitutionally sound. *United States v. Sanders*, 35 F.3d 61, 62–63 (2d Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 497, 130 L.Ed.2d 407 (1994); *Carter*, 981 F.2d at 647. The *Lopez* decision does not mandate a different result.

Defendant also contends that Count II should be dismissed because it is duplicitous. Defendant maintains that § 922(g)(1) bars receipt of a firearm, or possessing a firearm "in or affecting commerce." Defendant argues that the indictment, which charges defendant with "receiv[ing] and possess[ing]" a firearm, alleges two separate offenses in one count.

 I am not persuaded by this contention. Section 922(g)(1) makes it unlawful for a felon "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Thus, "receipt and possession are simply two means of violating the same provision ..." *United States v. Austin*, 99 F.R.D. 292, 299–300 (W.D.Mich.1983). By charging defendant with both receipt and possession of a firearm, then, "the indictment charges the commission of a single offense by

different means, and thus is not duplicitous." *Id.* at 299. *See also United States v. Harper*, 802 F.2d 115, 118–19 (5th Cir.1986) (defendant was charged with receipt and possession as single offense under one statute, and therefore did not face possibility of "duplicative punishment" for single act).

### CONCLUSION

Defendant's motions to suppress physical evidence and to dismiss Count II of the indictment are denied.

IT IS SO ORDERED.

---

**3.** While the Court in *Bass* held that § 1202(a) contained an interstate-commerce nexus, it was not until *Scarborough* that the Court was faced

with the question of what would constitute an adequate nexus.