**FILED**

Dec 05 2019, 6:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Daniel Hageman
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dennis Payne, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | December 5, 2019 <br><br> Court of Appeals Case No. <br> 19A-CR-394 <br><br> Appeal from the <br> Marion Superior Court <br><br> The Honorable <br> Marc Rothenberg, Judge <br><br> Trial Court Cause No. <br> 49G02-1710-F5-37833 |

**Vaidik, Chief Judge.**

# Case Summary

[1]  Following a May 2017 hit and run in Indianapolis that left a pedestrian dead, Dennis Payne Jr. was convicted of Level 5 felony failure to remain at the scene of an accident resulting in death and Level 6 felony obstruction of justice.

Payne now appeals, arguing that the police violated his Fourth Amendment rights when they seized his Toyota 4Runner—which matched the description of the SUV involved in the hit and run, had front-end damage consistent with a pedestrian strike, and was parked on a public street—without a warrant. Because Payne concedes that the police had probable cause to believe that his 4Runner was involved in the hit and run and the automobile exception to the warrant requirement applies to cars parked on property that is open to the public, we find no Fourth Amendment violation.

## Facts and Procedural History

[2] Around 6:30 p.m. on May 19, 2017, Jairo Marquez-Nava called 911 to report a possibly impaired driver in a gray SUV heading south on Holt Road in Indianapolis. The driver was swerving and then appeared to be asleep at a stoplight. While Nava was on the phone with the 911 operator, the light turned green, and the driver rapidly accelerated. Nava gasped, "he just hit a lady!" Ex. 1. According to Nava, the SUV swerved off the road, struck a pedestrian walking in the grass, and continued onto the Sam Jones Expressway. The pedestrian, Karen Turner, was transported to Eskenazi Hospital, where she was pronounced dead.

[3] Nava stayed on the phone with the 911 operator as he followed the SUV from the scene of the accident. Nava reported that the SUV stopped on the shoulder of the Sam Jones Expressway, where the driver got out and removed a broken piece—which Nava described as a one-foot shiny object—from the front

passenger side of the SUV.  Nava drove past the stopped SUV so that he did not look suspicious.  When he looped back, the SUV was gone.  Nava returned to the scene of the accident to speak with the police.

[4] Indianapolis Metropolitan Police Department Detective Kelley Rhoda, who works with IMPD's hit-and-run unit, spoke with Nava.  According to Detective Rhoda, Nava told her the following:

> He said that a silver or gray SUV initially dispatched as a Toyota, and then he said Mitsubishi, struck a woman heading southbound on Holt, turned onto Sam Jones.  He described a chubby white male, approximately 200 pounds, 5'11" with black hair wearing a black shirt.

Tr. Vol. II p. 227.  Detective Rhoda also learned that the SUV had "rear window stickers" and a "distinct tow hitch."  *Id.* at 242-43.

[5] A few days later, Detective Rhoda reviewed video surveillance recorded around 6:30 p.m. on May 19 from a business along the Sam Jones Expressway.  The video showed "a silver SUV on Sam Jones heading westbound that pulled over on the shoulder . . . momentarily and then proceed[ed] to the exit."  *Id.* at 236.  Detective Rhoda determined that the SUV was "a 2000 to 2002 Toyota 4Runner."  *Id.* at 230.

[6] Detective Rhoda then contacted the Indiana Bureau of Motor Vehicles "for a list of all 2000 to 2002 gray or silver Toyota 4Runners in Marion County."  *Id.* at 231.  She inspected each of the registered 4Runners for damage consistent with striking a pedestrian.  Finding none, she got the same information for

Morgan County, which borders the southwest corner of Marion County (according to Detective Rhoda, the SUV was heading southwest after the hit and run, *see* Tr. Vol. III p. 11).

[7] The BMV listed only one 2000 to 2002 silver or gray Toyota 4Runner registered in Morgan County. The registered owner of this 4Runner was Oklevueha Native American Church located at 7145 Bethany Park in Martinsville, which was the same address listed on Payne's Indiana driver's license.

[8] On June 12, Detective Rhoda went to 7145 Bethany Park, which she described as a "residence." Tr. Vol. II p. 238. She did not find a 4Runner there; however, a neighbor confirmed that a 4Runner was normally parked there and that the owner was affiliated with a Native American church in nearby Brooklyn. Detective Rhoda then drove to Brooklyn and stopped at the fire station to get the address of the church. The fire department gave Detective Rhoda the address, 106 South Church Street, and told her that "it looked like a house." *Id.* at 239. When Detective Rhoda arrived at 106 South Church Street, she found a silver 2002 Toyota 4Runner parked on the street with damage to the front passenger side hood, grill, light, and bumper. *See* Exs. 25-27, 30. The 4Runner also had a distinct tow hitch and stickers in the rear window. Ex. 29. Also at the address was a trailer, which displayed the name "Countertop Shop" and a phone number. Ex. 29. After calling for other members of IMPD's hit-and-run team and a Morgan County deputy sheriff to respond to the scene, Detective Rhoda called the phone number and asked to speak with "Dennis or D.J. Payne." Tr. Vol. II p. 245. The person who answered the phone

responded to that name. Detective Rhoda asked the person "about the trailer in the yard because [she] didn't want to tip him off to the fact that [they] were interested in [the 4Runner]." Tr. Vol. III p. 19. The person responded that he would come to the church. The person, however, never showed up. In the meantime, Douglas Heustis, IMPD's Chief Crash Investigator, arrived at 106 South Church Street. After viewing the front-end damage to the 4Runner, he believed that it was "consistent with a pedestrian crash or a pedestrian strike." *Id.* at 50. After waiting about 45 minutes, Detective Rhoda had the 4Runner towed to IMPD's tow lot in Indianapolis.

[9] The next morning, June 13, Detective Rhoda applied for, and was granted, a warrant to search the 4Runner. Ex. 38. Detective Rhoda found "miscellaneous damaged car parts in the [back] of the vehicle," including a headlight assembly and "a silver piece . . . [that] matche[d] the description of what Nava reported, approximately one foot shiny object that the driver appeared to remove from the front of the vehicle." Tr. Vol. II pp. 249, 250. There was also "bagged clothing that matched the description that Nava gave, a black shirt, black pants." *Id.* at 249. Near the driver's seat, Detective Rhoda found a Menards receipt dated May 19 at 3:33 p.m., which was about three hours before the accident.

[10] Detective Rhoda then went to Menards and asked to see video surveillance from May 19 around 3:30 p.m. The video showed "[a] person matching the description that Nava gave . . . purchasing two boards and a drink which matched the receipt." Tr. Vol. III p. 5. Detective Rhoda asked an employee if

there was "any account information associated with the receipt[,] and [the employee] said [that] the purchaser was the Counter[top] Shop" and that "[t]he name associated with [that] account was Dennis Payne." *Id.*

[11] At some point, Detective Rhoda learned that two people named James Price and Samantha Giles had information about the hit and run, and she interviewed them, learning the following information.[1] *Id.* Price, who is connected with Harvester's Baptist Church in Haughville, received a phone call on May 19 around 6:45 p.m. (which was shortly after the hit and run) that someone was dumping something behind his church. Price had known Payne for about twenty-five years, and Payne helped care for the church buildings. After Price got the call, he went to the church to investigate. When Price arrived, Payne's silver Toyota 4Runner was parked in its normal spot; however, it was parked "nose in" and "fairly close to the building." Tr. Vol. II p. 168. According to Price, Payne normally backed his 4Runner into the spot. Price then saw Payne's wife in a Kia. When Price approached the Kia to see what was going on, he saw Payne in the backseat. Payne's wife told him that Payne was "sick" and "very dehydrated." *Id.* at 169. Price told her to take him home. The 4Runner remained parked at the church for about the next ten days, which was unusual.

---

[1] Detective Rhoda apparently learned about Price and Giles after she applied for the search warrant on June 13, as there is no mention of Price or Giles in the search-warrant affidavit. *See* Ex. 38. No evidence was presented at trial as to why Detective Rhoda did not know about Price and Giles any sooner.

[12]   At the end of May, Giles, Price's home health aide, saw a post on Facebook that the police were looking for an SUV involved in a hit and run. According to the Facebook photo, the SUV had stickers in the rear window. Giles and Price compared the photo on Facebook to Price's 4Runner, which was still parked in the same spot at the church. Although Price wasn't prepared to say that Payne's 4Runner matched the photo on Facebook, he did note that the stickers on the rear window of the SUV in the photo looked similar to the stickers on the rear window of Payne's 4Runner. Price recognized one of the stickers, a "First Nation Chickamauga" sticker, because he had one on his car. *Id.* at 173. Giles observed that there was front-end damage to the 4Runner (which wasn't there before) and that the 4Runner was "extremely clean and sparkly" (it was normally "[d]usty"). *Id.* at 209. In addition, Giles noted that the stickers on Payne's 4Runner matched the ones in the Facebook photo. Believing that Payne's 4Runner was the SUV involved in the hit and run, Giles contacted the police. A few days later, a police officer came to the church to look at the 4Runner. Price was there at the time. After the officer left, Price called Payne and asked him what he had hit with his car. Payne responded, "Well, let's just say I don't know. Let's just say I don't know what I hit." *Id.* at 180-81. Price told Payne to get his SUV from the church, and it was gone the next day. Then, on June 12 (the day that Detective Rhoda went to Brooklyn), Payne called Price and said that the police and a tow truck were at Brooklyn and that they were going to tow his 4Runner. *Id.* at 182-83. Payne asked Price to get a key and take the 4Runner before it could be towed. *Id.* at 185-86. Price, however, said no.

[13]     In October 2017, the State charged Payne with Level 5 felony failure to remain at the scene of an accident resulting in death and Level 6 felony obstruction of justice. Payne later filed a motion to suppress the evidence found in his 4Runner and the information learned at Menards, arguing that his constitutional rights were violated when his 4Runner was seized without a warrant. The trial court denied Payne's motion to suppress.

[14]     A jury trial was held in September 2018. At trial, in addition to the evidence discussed above, Nava identified the 4Runner found at the church in Brooklyn as the SUV that was involved in the hit and run. Evidence was also presented that at 6:28 p.m. on May 19, 2017, the phone number associated with Payne made a call using a cell-phone tower that was located less than one mile from the accident scene. Tr. Vol. III pp. 39-40.

[15]     Following the jury trial, Payne was found guilty as charged. The trial court sentenced him to five years, with four years executed (three years in the DOC and one year on home detention) and one year suspended to probation.

[16]     Payne now appeals. We held oral argument in this case in the Adams County courthouse on November 12, 2019.

# Discussion and Decision

[17]     Payne contends that his constitutional rights were violated when the police seized his 4Runner without a warrant. Payne relies on both the Fourth

Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

# I. Fourth Amendment

[18] Payne argues that his Fourth Amendment rights were violated when the police seized his 4Runner without a warrant. The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. While the Fourth Amendment generally prohibits warrantless searches and seizures, there are exceptions. The State argues that the automobile exception applies here.

[19] Pursuant to the automobile exception, law-enforcement officers may seize and search automobiles without first obtaining a warrant so long as there is probable cause to do so. *See Collins v. Virginia*, 138 S. Ct. 1663 (2018); *Chambers v. Maroney,* 399 U.S. 42 (1970); *Carroll v. United States,* 267 U.S. 132 (1925). The rationale for the automobile exception is that automobiles are (1) readily mobile and (2) "subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *Collins*, 138 S. Ct. at 1669-70 (quotation omitted). "In the context of warrantless seizures involving automobiles, there exists a strong governmental interest, recognized under the Fourth Amendment, to ferret out crime and conduct necessary investigations before the vehicle and its occupants may be 'spirited away.'" *State v. Brereton*, 826 N.W.2d 369, 377-78 (Wisc. 2013) (quoting *Florida v. White*, 526 U.S. 559, 565 (1999)), *cert. denied.* "Therefore, as long as officers have

probable cause to believe that the vehicle is, or contains, evidence of a crime, warrantless seizures of automobiles may be lawful, provided that they are conducted reasonably." *Id.* at 378 (citing *Chambers*, 399 U.S. at 51-52). "Probable cause is not a high bar and is cleared when the totality of the circumstances establishes a fair probability—not proof or a prima facie showing—of criminal activity, contraband, or evidence of a crime." *Hodges v. State*, 125 N.E.3d 578, 581-82 (Ind. 2019) (quotations omitted).

[20] The State argues that the police properly seized Payne's 4Runner pursuant to the automobile exception because they had probable cause to believe that it was evidence of the hit-and-run crime. Payne concedes that there was probable cause to believe that his 4Runner was involved in the hit and run; however, he claims that the automobile exception does not apply here because his 4Runner was parked in a "residential area." Appellant's Br. p. 17. As support for this claim, Payne relies on the Indiana Supreme Court's opinion in *State v. Hobbs*, 933 N.E.2d 1281 (Ind. 2010). In *Hobbs*, police officers, without a warrant and after a drug dog alerted, searched the defendant's car, which was parked in the parking lot of a restaurant. On appeal, the defendant argued that the warrantless search of his car violated the Fourth Amendment. In addressing the automobile exception, our Supreme Court said:

> As the Supreme Court of the United States explained in [*California v. Carney*, 471 U.S. 386 (1985),] the exception applies to vehicles that are readily mobile and are found in a non-residential area. **The clear implication is that an operable vehicle found in a residential area may not be searched under**

> **this exception**, but one located in a non-residential area . . . is subject to the exception.

*Hobbs*, 933 N.E.2d at 1285-86 (citation omitted, emphasis added).

[21]     The State asserts that the Indiana Supreme Court "misread[]" *Carney*. Appellee's Br. p. 17. In *Carney*, the United States Supreme Court addressed whether "law enforcement agents violated the Fourth Amendment when they conducted a warrantless search, based on probable cause, of a fully mobile 'motor home' located in a public place." 471 U.S. at 387. In determining whether the motor home—which was parked in a parking lot in downtown San Diego—had ready mobility, the Court noted:

> When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes-temporary or otherwise-the two justifications for the vehicle exception come into play.

*Id.* at 392-93. As the Seventh Circuit explained when addressing the same claim that Payne makes here:

> [The defendant] misconstrues the meaning of *Carney.* In that case, the Supreme Court was faced with the issue of whether a mobile home comes within the automobile exception, and the Court looked to the location where the vehicle was parked solely for the purpose of determining whether the mobile home was being used more like an automobile (so that it would come within the exception) or more like a residence (so that a heightened expectation of privacy would exist, necessitating either a warrant or the existence of exigent circumstances before a search properly could be carried out). *Carney* does not establish

> a requirement that additional exigent circumstances be
> present merely because an automobile is parked at a residence.

*United States v. Reis*, 906 F.2d 284, 290-91 (7th Cir. 1990); *see also United States v. Brookins*, 345 F.3d 231, 237 (4th Cir. 2003) ("[I]n [*Carney*], . . . the Supreme Court held that a mobile home, on the facts presented, was more characteristic of an automobile than a fixed residence. The Court did look to the nature of the location where the vehicle was discovered, but only to ascertain whether the vehicle itself was, in an ontological sense, in use as a 'movable vessel' or as a fixed residence."). *Carney* does not stand for the proposition that "an operable vehicle found in a residential area may not be searched under th[e] [automobile] exception." *Hobbs*, 933 N.E.2d at 1285-86.

[22] In addition, the sentence in *Hobbs* cited by Payne is but one sentence that had no bearing on the ultimate decision reached by our Supreme Court. That is, in *Hobbs*, the defendant's car was not parked in a residential area; rather, it was parked in the parking lot of a restaurant. As such, the Court held, "Because [the defendant's] admittedly mobile vehicle was in the parking area of a restaurant, it was subject to the automobile exception and no warrant was required to search the vehicle if the officers had probable cause to believe it contained evidence of a crime." *Id.* at 1286. In other words, the Court did not address the scenario presented here of a car parked on a public street in a residential area.

[23] Moreover, the United States Supreme Court recently clarified in *Collins* that in order for the automobile exception to apply, a police officer must have "a

lawful right of access to [the] vehicle." 138 S. Ct. at 1672. When a car is parked "within a home or its curtilage," "[t]he automobile exception does not afford the necessary lawful right of access . . . because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage." *Id.* Thus, while the automobile exception does not apply when a car is parked on private residential property, it does apply when a car is parked on property that is open to the public, such as a city street or a business parking lot. *See id.* at 1673 n.3. At oral argument, defense counsel conceded that Payne's 4Runner was not parked on private residential property. *See* Oral Arg. at 16:10.

Payne also relies on the Indiana Supreme Court's opinion in *Brown v. State*, 653 N.E.2d 77 (Ind. 1995). In *Brown*, the Court held that the automobile exception did not apply "[s]ince there were no exigent circumstances **and** [the defendant's] automobile was located in a residential parking area." *Id.* at 81 (emphasis added). But given what we just said above and that the United States Supreme Court clarified after *Brown* that the automobile exception "has no separate exigency requirement," *Maryland v. Dyson*, 527 U.S. 465 (1999), *Brown* does not support Payne's claim. Accordingly, the police did not violate Payne's Fourth Amendment rights when they seized his 4Runner without a warrant.

# II. Article 1, Section 11

Payne also argues that the warrantless seizure of his 4Runner violated Article 1, Section 11 of the Indiana Constitution. The State argues that Payne did not

raise this issue in the trial court, thereby waiving it for purposes of appeal. Even assuming that Payne has preserved this issue for our review, we find no Article 1, Section 11 violation.

[26] Article 1, Section 11 of the Indiana Constitution provides in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizure, shall not be violated." Although this language largely tracks that of the Fourth Amendment, we interpret and apply it independently. *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001). The reasonableness of a search or seizure under the Indiana Constitution "turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). Those circumstances may include a balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law-enforcement needs. *Id.* at 361.

[27] Here, the police had a significant degree of concern, suspicion, or knowledge that Payne's 4Runner was involved in the hit and run that left a pedestrian dead. That is, Detective Rhoda had a description of the SUV involved in the hit and run from witnesses, she watched surveillance video and identified the target vehicle as a 2000 to 2002 silver Toyota 4Runner, and Payne's 4Runner had damage to the front hood, grill, headlight, and bumper that was consistent with a pedestrian strike. As for the degree of intrusion, after the police called Payne and he did not come to 106 South Church Street, the police had his

4Runner towed to IMPD's tow lot in Indianapolis. The following morning, the police obtained a search warrant. While Payne was deprived of possession of his 4Runner before the search warrant was obtained, it was less than twenty-four hours. Finally, the extent of law-enforcement needs was high. That is, the police were investigating a hit and run that left a pedestrian dead. The police conducted a thorough investigation that led them to Payne's 4Runner. When the police found Payne's 4Runner parked on a public street, it had front-end damage that was consistent with a pedestrian strike. The police then called Payne to have him come to the scene, but Payne never showed up. At this point, it was reasonable for the police to believe that Payne would move or hide his 4Runner (as he had previously done with his 4Runner at the church in Haughville). The police then had the 4Runner towed to Indianapolis, applied for a search warrant the following morning, and only searched it after obtaining the warrant. *Cf. Brown*, 653 N.E.2d at 80 (concluding that the police violated Article 1, Section 11 of the Indiana Constitution when they **searched** the defendant's car without a warrant). Under the totality of the circumstances, the conduct of the police in seizing Payne's 4Runner until a search warrant was obtained was not unreasonable.[2]

---

[2] Payne argues that *Buckley v. State*, 886 N.E.2d 10 (Ind. Ct. App. 2008), controls this case. In *Buckley*, the defendant was a suspect in a homicide. Two days after the murder—which provided "ample time for the perpetrator to dispose of the murder weapon and other evidence of the crime"—the police, without a warrant, seized the defendant's car and then searched it, finding a handgun that was not connected to the murder. *Id.* at 14-15. The defendant was convicted of carrying a handgun without a license and appealed, arguing that the seizure and search violated Article 1, Section 11 of the Indiana Constitution. Concluding

Affirmed.

Kirsch, J., and Altice, J., concur.

---

that the police did not act reasonably, we reversed the defendant's conviction. This case is clearly distinguishable from *Buckley*. In *Buckley*, the police hoped to find evidence in the car that the defendant committed the murder. Here, however, Payne's damaged 4Runner itself was evidence that Payne was the hit-and-run driver, and the police did not search the 4Runner until after getting a warrant.