Antione W. TUCKSON, Appellant,

v.

UNITED STATES, Appellee.

No. 11–CF–552.

District of Columbia Court of Appeals.

Argued Dec. 19, 2012.

Decided Oct. 3, 2013.

Justin Murray, Public Defender Service, with whom James Klein, Jaclyn Frankfurt, Shilpa S. Satoskar, and Premal Dharia, Public Defender Service, were on the brief, for appellant.

Trevor N. McFadden, Assistant United States Attorney with whom Ronald C. Ma-chen Jr., United States Attorney, and Elizabeth Trosman, Chrisellen R. Kolb, Kimberley Nielsen, and Amanda Winchester, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, Associate Judges, and RUIZ, Senior Judge.

RUIZ, Senior Judge:

Antione Tuckson[1] appeals his convictions for carrying a pistol without a license, unlawful possession of a firearm, and unlawful possession of ammunition.[2] Tuckson's convictions stem from the discovery of a loaded pistol and extra ammunition in his car. The search of Tuckson's car occurred after he was arrested for possession of a prohibited weapon and impersonating a police officer. On appeal, Tuckson argues that the police lacked probable cause to arrest him, and that the trial court erred when it denied his motion to suppress the gun and ammunition. We agree, and reverse Tuckson's convictions.

## I. The Motion to Suppress

### Tuckson's Arrest

The following facts were presented at the hearing on Tuckson's motion to suppress. On March 18, 2009, Tuckson drove his 2001 Chevy Impala into a cul-de-sac on 37th Street, S.E. Tuckson's car was outfitted with dark windows, long antennas, a "police-style dash light," and other features that made it appear to be "an undercover or unmarked police vehicle." Unluckily for Tuckson, members of the Metropolitan Police Department's gun recovery unit happened to be leaving the

---

1. At oral argument counsel for appellant explained that although appellant's name is pronounced "Antoine," it is spelled "Antione."

2. Violations of, respectively, D.C.Code §§ 22–4504(a), 22–4503(a)(2), 7–2506.01(a)(3) (2001).

cul-de-sac as he drove by. Detective Kirk Delpo noticed Tuckson's car, and realized that the license plate was inconsistent with those used on police vehicles. Delpo ran Tuckson's plates, and determined that Tuckson, not the police department, owned the car. Based on this information, Delpo suggested to the other officers that they stop Tuckson and investigate.

Before the officers could stop Tuckson, he parked in front of a fire hydrant and got out of the car. He was wearing "nice" clothes—"a pair of slacks" and "a button-down shirt"—and a pair of "thin gloves." Delpo thought Tuckson's gloves looked like "the style that police officers would wear." Tuckson walked to a nearby doorway, where he gave someone a set of keys.

As Tuckson walked back to his car, he was stopped by Sergeant Sloan. Sloan asked Tuckson "if he was a police officer," and Tuckson answered that he was not. Sloan then informed Tuckson that "he was parked illegally and the tint on his window appeared to be illegal." Sloan requested Tuckson's driver's license, registration and insurance, which Tuckson produced.[3] In response to further questioning by other officers, Tuckson denied that he had "any guns," refused to give consent for a search, and then handed over his keys so that the officers could conduct a window tint check.

In order to conduct the window tint check, Officer Malsona (another officer on the scene), opened Tuckson's driver's side door. After opening the door, Malsona noticed a collapsible baton, or "asp,"[4] in a holster in the door pocket. Malsona then alerted the other officers to the presence of the baton, and Tuckson was placed under arrest because he had a "prohibited weapon ... in the vehicle" and because he "appeared to be impersonating a police officer." At no point during this encounter with the police did Tuckson carry, reach for, make gestures toward, or use the baton. After Tuckson was placed under arrest, Delpo searched the car. Under a jacket in the front passenger seat, Delpo found a loaded semi-automatic pistol, "police handcuffs, and an extra magazine." After the search concluded, Tuckson's vehicle was seized.

### The Trial Court's Findings

The trial court found that the officers had reasonable suspicion to detain appellant and investigate the illegal tinting on his windows and his illegally parked car. Further, the trial court determined that reasonable suspicion existed to investigate whether appellant was impersonating a police officer. The court ruled that, when he was detained, appellant voluntarily handed-over his keys, and the police permissibly opened the driver's side door, where the officer observed the baton.

At that point, the trial court held, "the police had probable cause to believe that [Tuckson] intended to use [the baton] unlawfully in that [Tuckson] intended to use it to in the future commit the crime of impersonating a police officer." The court elaborated, noting that the police "had all this information that suggested that he was going to do so in the future." Because the court "believe[d] that [impersonating a

3. Tuckson apparently only had a photocopy of his license, but other than being odd, no additional import appears to have been attached to Tuckson's failure to produce his actual license.

4. "Asp" appears to be an acronym for the name of a company that makes police batons (A.S.P.—Armament Systems & Procedures, Inc.), and seems to have become a generic term for any police baton. It appears both un-capitalized and capitalized in the record. For convenience, this opinion will use "baton" where possible.

police officer] would be an unlawful use of the [baton]," it concluded that the police "had probable cause" for the "unlawful use" element of possession of a prohibited weapon.[5]

The trial court found that the officers had probable cause to believe that Tuckson possessed the baton with the intent to use it unlawfully, i.e., to use it in the future to commit the crime of impersonating a police officer. The trial court also concluded that, although appellant had not yet committed the crime of "impersonating a police officer," there was probable cause to believe that appellant "was about to commit" that crime. But the court believed that, unless the police could "show that a crime was committed," they did not have probable cause to arrest for that offense. After analyzing the Supreme Court's opinion in *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), the trial court concluded that officers could have searched the car only if they believed the car contained further evidence of the crime for which appellant had been lawful-

ly arrested, i.e., possession of a prohibited weapon.[6] The court upheld the search at issue in this case on that basis, ruling that the officers had reason to believe the car would contain additional evidence of appellant's intent to commit the crime of impersonating a police officer, which the court had identified as the "unlawful use" appellant intended to make of the baton, making it a prohibited weapon.

## II. Analysis

■■■ "When reviewing the denial of a motion to suppress, we defer to the trial court's findings of fact, but we determine questions of law *de novo*." *Napper v. United States*, 22 A.3d 758, 766 (D.C.2011) (citation omitted). Whether the facts found by the trial court—to which we defer—suffice to establish probable cause is a question of law. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). However, "[i]t is well settled that an appellate court may affirm a decision for reasons other than

5. The court also cited precedent from the D.C. Circuit (the parties agree that the court was referring to *United States v. Broadie*, 452 F.3d 875 (D.C.Cir.2006), although it mistakenly named another case), where the "surrounding circumstances" of the discovery of a baton gave the police "probable cause to believe" that the defendant "intended to use it so as to inflict great bodily injury." *Id.* at 883. However, the trial court noted that it was "a little loathe to come to that same conclusion" on the basis of that precedent alone. In any event, the court determined that "one could conclude here that the asp wasn't being used for self-defense purposes," which, according to the court, "would make its use unlawful, ... particularly if it was being used to commit the crime of impersonating a police officer."

6. The trial court considered the motion to suppress under the principles enunciated in *Gant* because at the time Tuckson was placed under arrest, he was "standing over by the sidewalk on the passenger side of the vehi-

cle," would have needed to take "a couple of steps forward" in order to be able to touch the vehicle, and was "in the custody of a large contingent of police officers." Thus, as the trial court found, Tuckson was not "within reaching distance" of the car's passenger compartment. *Gant*, 556 U.S. at 346, 129 S.Ct. 1710. Tuckson concedes on appeal that the search took place prior to the *Gant* opinion and that, under the law applicable at the time, the police could have searched his car so long as they had probable cause to arrest appellant of any crime. *See New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), *abrogated by Gant*, 556 U.S. at 342–43, 349, 129 S.Ct. 1710 (rejecting lower courts' "broad reading" of *Belton* as permitting vehicle searches incident to all arrests of recent occupants); *United States v. Debruhl*, 38 A.3d 293, 296 (D.C.2012) (citing this court's post-*Belton* cases, before *Gant*). In light of appellant's concession, the trial court's application of *Gant* will not be addressed in this opinion.

those given by the trial court," provided there is a sufficient evidentiary basis and no procedural unfairness to the parties. *Purce v. United States*, 482 A.2d 772, 775 n. 6 (D.C.1984) (citation omitted). Thus, in order to ensure that there is no "substantial basis" for upholding the trial court's order, *Dickerson v. United States*, 677 A.2d 509, 512 (D.C.1996) (internal citation and quotation marks omitted), this opinion will analyze whether the search was valid under several theories—two presented to the trial court and a third presented in the government's brief on appeal as an alternative basis for affirmance. We decline to decide a fourth theory raised in response to the court's request for supplemental briefing after oral argument.

*Possession of a Prohibited Weapon and Carrying a Dangerous Weapon*

■ First we address whether, as the trial court concluded, the police had probable cause to arrest appellant for a violation of D.C.Code § 22–4514(b) (possession of a prohibited weapon) or, applying similar logic, the trial court could have permissibly concluded the arrest was valid under D.C.Code § 22–4504(a) (carrying a dangerous weapon). As we have stated before, "[t]he determination of probable cause is an inexact judgment." *Price v. United States*, 429 A.2d 514, 516 (D.C.1981). "The classic formulation is that probable cause exists where the facts and circumstances within ... the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Perkins v. United States*, 936

A.2d 303, 306 (D.C.2007) (internal citations, alterations, and quotations omitted). Probable cause to effect an arrest must "be supported by more than mere suspicion but need not be based on evidence sufficient to sustain a conviction." *Id.* (internal quotation omitted).

■ Both § 22–4514(b) and § 22–4504(a) prohibit the possession of "dangerous weapons."[7] And although the trial court considered whether probable cause was established solely under § 22–4514(b), we note that the only relevant difference between the two statutes is § 22–4514(b)'s additional requirement of an "intent to use [the dangerous weapon] unlawfully against another," an element which does not appear in § 22–4504(a). Accordingly, as the government urges for the first time on appeal, if the baton was, in fact, a dangerous weapon within the meaning of § 22–4504(a), appellant could have been arrested for carrying a dangerous weapon regardless of whether he had the requisite intent to use it "unlawfully against another" under § 22–4514(b).

■ Our case law explains that a "dangerous weapon is one which is likely to produce death or great bodily injury by the use made of it. Such instrument may be dangerous in its ordinary use as contemplated by its design and construction, or where the purpose of carrying the object, under the circumstances, is its use as a weapon." *Scott v. United States*, 243 A.2d 54, 56 (D.C.1968). In other words, an instrument may either be "inherently dangerous" or, if not, "can become dangerous by its use as a weapon" or where there is evidence that "an individual intends to use

---

7. D.C.Code § 22–4514(b) states that "[n]o person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or *other dangerous weapon.*"

(emphasis added.) D.C.Code § 22–4504(a) states that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any *deadly or dangerous weapon capable of being so concealed.*" (emphasis added.)

an object as a dangerous weapon." *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990). Therefore, although D.C.Code § 22–4504(a) does not refer to any mental state in the statutory text, when the object is not a listed weapon or an "inherently dangerous" one, an individual's intent to use the object as a weapon is required before carrying the object is criminalized.[8]

There is no dispute that the baton in this case is not listed as a *per se* prohibited weapon in either § 22–4514(b) or § 22–4504(a). Thus, we ask whether the baton is an "inherently dangerous" weapon. Our case law defines inherently dangerous weapons as those objects which are "dangerous in [their] ordinary use as contemplated by [their] design and construction." *Scott*, 243 A.2d at 56. There is "little authority" on the inherent dangerousness of police batons. *Broadie*, 452 F.3d at 882. However, we agree with the District of Columbia Circuit Court of Appeals' determination in *Broadie*, that the balance of the available authority suggests that "[police] officers [do not] ordinarily inflict great bodily injury when they use the device," and that a "baton is designed so it can be used to control suspects without inflicting serious injury." *Id.* (quoting *Armament Sys. & Procedures, Inc. v. Monadnock Lifetime Prods., Inc.*, 168 F.3d 1319, 1998 WL 537746, at *1 (Fed.Cir. Aug. 7, 1998) (unpublished)). Accordingly, we conclude that a baton is not "inherently dangerous" by virtue of its "ordinary use" or "design and construction." *Scott*, 243 A.2d at 56.

Which is not to say that possession of a baton cannot ever be grounds for an arrest under § 22–4504(a). As the *Broadie* court observed, "a 16–inch steel rod—like the more commonplace lead pipe—is capable of inflicting great bodily injury when used for that purpose." 452 F.3d at 882. However, just as the dangerous potential of a lead pipe would not furnish probable cause to arrest, for example, a plumber who is found in possession of the tools and materials of his trade, the law requires further inquiry in this case into the surrounding circumstances of the discovery of the baton in Tuckson's car. As we have explained, "[s]ome factors to consider when determining whether an individual intends to use an object as a dangerous weapon are (1) the design of the instrument, (2) the conduct of the defendant prior to his arrest, (3) any physical alteration of the object, and (4) the time and place of its possession." *Strong*, 581 A.2d at 386 (citation omitted).

After evaluating these factors, we cannot conclude that a person "of reasonable caution," *Perkins*, 936 A.2d at 306, would have probable cause to believe that Tuckson intended to use the baton as a weapon. In this case, the design and purpose of the instrument, as we noted earlier, are not necessarily for offensive use as a weapon. Tuckson suggests that a baton could also be used merely as a prop to complete a hobbyist's police officer costume. Moreover, none of the attendant facts would give rise to a conclusion that Tuckson's intent was to use the baton as a weapon. Tuckson did not display, wield, or even hold the baton in the presence of the police officers. *Cf. In re S.P.*, 465 A.2d 823, 827 (D.C.1983) ("It was undisputed at trial that

---

8. Although these considerations are analytically similar to the considerations that would go into the element of "to use unlawfully against another" in § 22–4514(b), the circumstances surrounding the discovery of an instrument can establish it as a dangerous weapon without necessarily also establishing intent to use the weapon unlawfully against another. *See Broadie*, 452 F.3d at 881 (circumstances surrounding discovery did not establish "possession of a prohibited weapon," but did establish crime of "carrying a dangerous weapon").

appellant both intended to and did carry and twirl around his body the nunchaku in the midst of a crowd of onlookers."). There was no indication that Tuckson had altered the baton in any fashion. Further, the baton was discovered during daylight hours, holstered, and tucked into the car's door pocket. *Cf. Broadie*, 452 F.3d at 883 (noting intent to use baton as weapon supported by evidence that defendant was encountered "late at night in a high-crime area" and the baton was "within arm's reach").

The trial court essentially reached these same conclusions. The trial court was "a little loathe" to come to the conclusion that the baton was a "per se ... dangerous weapon," and never made a finding that Tuckson intended to use the baton as a weapon. Instead, the trial court found probable cause to believe Tuckson possessed the baton in order to assist him in the future commission of the crime of "impersonating a police officer." We cannot affirm the trial court's ruling on this basis. Intending to use the baton as a prop to complete a fraudulent act is not the same as intending to use the baton as a weapon "unlawfully against another"—that is, as a weapon. Nor is it enough to make the baton a dangerous weapon. We have held, for example, that an intent to use an inoperable air pistol "to frighten others" was not sufficient to establish an intent to use the air pistol as a dangerous weapon within the meaning of D.C.Code § 22–4504(a). *Strong*, 581 A.2d at 387 (citing previous codification of carrying a dangerous weapon statute at § 22–3204 (1981)). We explained that the purpose of the carrying a dangerous weapon statute was "protecting the safety of the public," and accordingly we declined to affirm a conviction under that statute "in cases such as this where there is no evidence that the defendant planned to harm anyone." *Id.* For the same reason, we cannot affirm the trial

court's probable cause determination in this case without evidence that Tuckson "planned to harm anyone" with the baton. As there was no probable cause to believe that the baton was a "dangerous weapon," there was no probable cause to arrest Tuckson under D.C.Code § 22–4504(a), or, *a fortiori*, D.C.Code § 22–4514(b).

### *Impersonating a Police Officer*

■ Although the trial court specifically found that the police lacked probable cause to believe that Tuckson had *already* committed the offense of impersonating a police officer, it did find that probable cause existed to believe that Tuckson "was about to commit the crime of impersonating a police officer." However, the trial court expressed some uncertainty about whether the police were permitted to make an arrest if they had probable cause to believe a crime was "going to be committed in the future." Accordingly, we must also inquire whether probable cause to believe that appellant was *about* to commit the crime of impersonating a police officer could have justified his arrest. We conclude that it did not.

To be clear, we share the trial court's doubt that the Fourth Amendment permits the police to arrest (as opposed to temporarily detain) a person to deter the future commission of a crime. The government quotes *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), as authority for the proposition that the police may arrest a suspect upon probable cause to believe that "the suspect has committed, is committing, or is about to commit an offense." We note, however, that the "is about to commit an offense" language is not included in a long line of cases, including more recent ones, in which the Supreme Court describes the probable cause standard. *See, e.g., Safford Unified School Dist. No. 1 v. Redding*, 557 U.S.

364, 370, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) (referring to the "belief that an offense has been or is being committed") (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), and *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (citing *United States v. Watson,* 423 U.S. 411, 417–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), and *Brinegar* ).[9] Further, the government cites no cases in its brief where an arrest was upheld on probable cause that a crime was about to be committed.[10] Accordingly, we are doubtful that an arrest to *prevent* a crime from being committed can be justified. Even if it were permitted by the Fourth Amendment, the phrase "about to commit" implies immediacy, and we can easily conclude that the officers in this case lacked probable cause to believe that Tuckson's conduct would rise to the level of the crime of impersonating a police officer in the immediate future.

First, we note our agreement with the trial court's conclusion that the police lacked probable cause to believe that appellant had already committed or was in the process of committing the crime of impersonating a police officer. Under D.C.Code § 22–1406 (2001), it is "a misdemeanor ... for any person, not a member of the police force, to falsely represent himself as being such [a] member, with a

fraudulent design." Accordingly, we must look for probable cause of both (1) false representation, and (2) fraudulent design. A false representation need not be an explicit statement, but can be any "intentionally conveyed ... impression." *Gary v. United States,* 955 A.2d 152, 155 (D.C. 2008). A fraudulent design, however, requires some "evidence that the defendant impersonated a police officer to deceive another in order to gain some advantage thereby." *Id.* This advantage "need not be monetary or even material in nature." *Id.*

It is undisputed that Tuckson's car looked and was lawfully equipped like an unmarked police vehicle.[11] Under the circumstances, we are willing to assume, without deciding, that when the officers discovered the baton, a common piece of police equipment, they had probable cause to believe that Tuckson was implicitly falsely representing himself as a police officer.[12] However, we see no evidence that Tuckson had a "fraudulent design." On appeal and at trial, the government has suggested that Tuckson's use of an illegal parking spot (in front of a fire hydrant) was evidence of his effort to gain an advantage, specifically the advantage of avoiding punishment for illegal parking. But as the trial court noted, Tuckson "might just [have been] ... parking illegally," and we see no facts that would convert that momentary action—Tuckson parked the car in front of the hydrant for the few minutes it took to deliver keys—to

9. None of the cases cited in *DeFillippo* after the sentence quoted by the government in its brief contains the "about to commit" language, nor do their facts support it.

10. In the *DeFillippo* case, for example, the arrest was upheld based on "abundant probable cause" that the conduct the officer observed—a suspect's evasive and inconsistent answers to a request that he identify himself—had actually violated an ordinance. 443 U.S.

at 37, 99 S.Ct. 2627. The "about to commit" language is pure dictum.

11. With the exception of the unlawfully tinted windows.

12. One officer testified that he thought that Tuckson was dressed in a manner similar to the garb often worn by plain clothes policemen. We give little weight to this particular fact. Tuckson's clothes, though "nice," were not otherwise remarkable or distinctive.

anything more sinister than ignorance of or indifference to the District's parking laws.

Similarly, we do not think that, viewed in context, the evidence supports the government's suggestion that "appellant's portrayal of himself as a police officer and his Impala as an unmarked police vehicle also aided his attempt to avoid being ticketed for illegal tinting." Throughout his interaction with the officers, Tuckson acted in a straightforward manner: He made no attempt to claim that the window tinting was lawful, allowed the officers to check his car windows, and quickly acknowledged he was not a police officer. Thus, we think that, like appellant's conduct in parking in front of a fire hydrant, the mere fact that he had illegal window tinting is insufficiently assertive of intent to constitute an effort to deceive another person that he was a police officer and thereby gain an unfair advantage.

A close reading of the trial court's decision demonstrates that it was the lack of evidence of a specific fraudulent design that led the trial court to conclude that although Tuckson might be "about" to commit the crime, he was not currently committing it. However, we think this deficiency also afflicts the trial court's conclusion that the police had probable cause to believe Tuckson was "about" to commit the crime of impersonating a police officer. Probable cause may not rest on a "mere suspicion" of criminal activity. *Rucker v. United States,* 455 A.2d 889, 891 (D.C. 1983). When asked whether he was a police officer, Tuckson immediately and truthfully said he was not. Aside from driving a car decked out with police gear, Tuckson was not seen acting like a police officer. At most, in this case, the police had only a " 'hunch' or a 'gut' feeling" that, at some point in the future, Tuckson might attempt to use his police trappings to de-

ceive another person. *In re T.H.,* 898 A.2d 908, 913 (D.C.2006) (quoting *Brown v. United States,* 590 A.2d 1008, 1014 (D.C. 1991)). However, there is no " 'objective justification' " for that suspicion in this record, *id.,* and we cannot uphold an arrest based on a hunch that a civilian appearing in broad daylight with legally possessed police-related equipment may be up to no good. *Cf. United States v. Reis,* 906 F.2d 284, 288 (7th Cir.1990) (noting that suspect "can hardly be punished for driving an automobile that resembles an unmarked police car," but that activation of police-type fireball on dashboard and aggressive behavior accusing undercover detectives of moving violations provided probable cause to believe suspect was impersonating a police officer). We see nothing in the record from which a reasonable police officer could have concluded that Tuckson had any specific "fraudulent design" in mind at the time of his arrest. Therefore, there was no objective basis to support probable cause that Tuckson's conduct was "about to" become criminal in nature.

### The Automobile Exception

Finally, we turn to an issue raised neither before the trial court nor in the parties' initial briefs to this court. Following oral argument, we requested additional briefing on the "automobile exception," a doctrine that allows police to search an automobile without a warrant if they have probable cause to believe the car contains " 'contraband or evidence of a crime.' " *Holston v. United States,* 633 A.2d 378, 385 (D.C.1993) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In response, Tuckson argues that the government has waived this argument by failing to present it at trial or on appeal. He also argues that, in any event, the "automobile exception" does not apply in this case. After considering the arguments submitted by

the parties at our direction, we decline to affirm the trial court's order on this basis.

 "It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived." *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993); *cf. Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (noting that points without "supporting argument in [the party's] brief" are "consider[ed] . . . to be abandoned"). And although we will "make our own inquiry" in the unusual circumstance when the government "does not defend" a judgment "on the merits" and "effectively conced[es] error," *Randolph v. United States*, 882 A.2d 210, 216 (D.C.2005), we are not presented with that scenario here. *See also Rose*, 629 A.2d at 533–34 (analogizing the court's role in those cases to the one it fills under *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), when a defendant's attorney claims there is no "non-frivolous issue warranting reversal of the client's conviction"). Rather, here "the government urges affirmance and has selected the arguments it believes are best suited to achieve that end." *Rose*, 629 A.2d at 534. Since the government has "assumed its traditional role of advocate . . . the adversary system should be allowed to function as such." *Id. Rose* identifies some other situations in which this court will reach issues that have not been raised by the parties, but none of those circumstances applies here. *See id.* at 537.

 In addition to considerations of good order, judicial efficiency, and respect for the proper role of institutional litigants that argue against our consideration of an argument that the government has not seen fit to present, we note that application of the automobile exception to this case is not one we could "easily resolve" or that is "beyond serious debate." *Id.* (internal citation omitted). In order for the automobile exception to apply, the police must have probable cause to believe that a car will contain either contraband or evidence of a crime. *See Holston v. United States*, 633 A.2d 378, 385 (D.C.1993). As we have previously discussed, none of the visible items in appellant's car (other than the tint on the windows) was illegal for a civilian to possess. Nor did Tuckson's conduct or statements to the police suggest any connection between these items and any criminal activity. *Cf. Wyoming v. Houghton*, 526 U.S. 295, 298, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999) (officers' search of car justified after driver admitted that hypodermic needle in his pocket was for drugs).

To find probable cause on the facts the officers had in this case, we would have to endorse the generalization that any person whose car is lawfully equipped, like Tuckson's, with police-type equipment, is likely to also carry guns or evidence of fraudulent intent.[13] There is no factual basis in

---

**13.** We are not persuaded by the summary conclusion that there was probable cause to apply the automobile exception in *Reis*, 906 F.2d at 291, on which the government relies. In *Reis*, before the court turned to discuss the automobile exception, it had already determined that there was probable cause to arrest the driver for IPO, a holding that we have cited above as supporting the conclusion that there was no such probable cause in this case. *Reis* also was a pre-*Gant* case, and, therefore, the officers would have been authorized to search the car incident to the driver's arrest, without need of additional justification to search the vehicle. See note 6 *supra*. Moreover, in *Reis*, what the appellant argued was that the automobile exception does not apply in the case of a vehicle that is not in motion or being driven, but parked in front of a residence, an argument the court analyzed and rejected. *Reis*, 906 F.2d at 290–91. The opinion does not reveal that there was a challenge to the nature and quantum of evidence of probable cause to search the car for contraband or evidence of a crime, and the court

this case, or knowledge gleaned from a long line of cases, however, to support such a generalization. Moreover, the probable cause determination is not a theoretical exercise that can be based on generalizations, but an individualized judgment, based on objective, observable "facts and circumstances" indicating commission of a crime by a particular person. *Perkins*, 936 A.2d at 306 (noting that probable cause "must be 'particularized' with respect to the person to be searched or seized" (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979))). Were we to uphold the search of Tuckson's car, we would be endorsing an unacceptable generalization as support for probable cause.[14] The police may not rely on an assumption that people whose cars are lawfully equipped with police gear possess either guns or evidence of unlawful fraud, in deciding whether a particular individual with such a vehicle is likely to do so.[15]

Thus, both for reasons of procedural good order and because the matter is debatable, we follow our earlier opinion in *Rose* and decline to consider the applicability of the "automobile exception" in this case.

Accordingly, we conclude that the trial court's denial of the motion to suppress cannot be upheld, and that the gun and ammunition found in the car should have been suppressed. As that evidence was central to the government's case, we reverse appellant's convictions.[16]

*Reversed.*

THOMPSON, Associate Judge, dissenting:

For the reasons explained in the majority opinion, I agree that the police in this case lacked probable cause to arrest appellant for possession of a prohibited weapon.[1] Whether they had probable cause to arrest him for carrying a dangerous weapon is a much closer question[2] in my judg-

---

does no more than mention it in a conclusory sentence. *Id.*

**14.** This generalization is distinguishable from the oft-cited proposition, supported by many cases over the years and expert testimony, that "drugs and weapons go together." *E.g., Peay v. United States*, 597 A.2d 1318, 1321 (D.C.1991) (en banc) (citing *United States v. Payne*, 805 F.2d 1062, 1065–66 (D.C.Cir.1986) (collecting cases), and *Irick v. United States*, 565 A.2d 26, 31 (D.C.1989) (expert testimony)). The facts in this case, however, do not support such an inference because the officers had not seen any drugs before they found the gun during the warrantless search.

**15.** The fact that the search did actually reveal the presence of contraband cannot affect our analysis. It has been established beyond peradventure that "[a] search is not to be made legal by what it turns up; it is good or bad when it starts and does not change character from its success." *Brown v. United States*, 590 A.2d 1008, 1013 (D.C.1991) (citing *United States v. Di Re*, 332 U.S. 581, 595, 68 S.Ct.

222, 92 L.Ed. 210 (1948), and *Smith v. United States*, 353 F.2d 838, 840 n. 1 (D.C.Cir.1965)).

**16.** The government has not argued otherwise.

**1.** That is because they had no basis for believing that he intended to use the police baton they found in the door pocket of his vehicle "unlawfully against another." D.C.Code § 22–4514(b) (2012 Repl.).

**2.** "[A] required element of CDW," *see* D.C.Code § 22–4504(a) (2012 Repl.), is that the defendant have "carried the [weapon] for the purpose of using it as a dangerous weapon[.]" *In re M.L.*, 24 A.3d 63, 67 (D.C.2011); *see also United States v. Broadie*, 452 F.3d 875, 882 (D.C.Cir.2006) ("[W]hat little authority there is on the matter suggests an ASP baton is designed so it can be used to control suspects without inflicting serious injury.") (internal quotation marks omitted); *but see id.* at 883 ("[A] reasonable officer surely would believe that a civilian, presumably without police training, would likely inflict great bodily injury when using a steel rod in self-de-

ment (and I likely would not have written in dissent if that had been the only issue). I believe the officers did have probable cause to arrest appellant for impersonation of a police officer.[3] In my view, the facts that (1) the vehicle he was driving was outfitted to look like and was equipped like a police vehicle, (2) the vehicle had windows tinted to an illegal degree, and (3) appellant parked the vehicle in front of a fire hydrant, were a sufficient basis for a reasonable belief (albeit not certitude) that appellant sought to pass himself off as a police officer with fraudulent design (i.e., with an expectation that he could drive with illegally tinted windows and park next to a fire hydrant without penalty).[4]

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). But even if, as my colleagues in the majority conclude, the evidence of fraudulent design was lacking, there are additional reasons why we should affirm the trial court's denial of the motion to suppress: (1) that the search of appellant's vehicle was lawful under the so-called "automobile exception" to the Fourth Amendment warrant requirement, and (2) that, on the record before us, we

should not hesitate to rely on that rationale even though the government did not rely on it in this court until we requested supplemental briefing on the issue.

## I.

I briefly recap the pertinent facts. The officers involved in appellant's arrest were patrolling in "an area of high violence" where they had made several arrests for firearms offenses. They observed appellant's vehicle drive into a cul-de-sac. His vehicle had dark tinted windows (permitted for and, according to Detective Kirk Delpo, "often times ... see[n] [on] police vehicles"), a "police-style" dash light, two police-style long antennas on the back, a disk-like tracking device found on police vehicles, and a "Thin Blue Line sticker" that Detective Delpo testified is "often used by police officers" and is "supposed to be sold exclusively to police officers to show other police officers that ... it's a police officer driving in that vehicle." Detective Delpo explained that "a lot of police departments, including our police department," use Chevy Impalas (which are "sold as fleet cars") as police vehicles. He testified that "[a]ll of these things" made the car "look[ ] like an undercover or unmarked police vehicle" or "some sort of

---

fense. Indeed, of all people a police officer specially trained in the use of an ASP baton is the most likely to know just how dangerous the baton may be in the hands of an untrained person.").

3. *See* D.C.Code § 22–1406 (2012 Repl.) (providing in pertinent part that "[i]t shall be a misdemeanor ... for any person, not a member of the police force, to falsely represent himself as being such member, with a fraudulent design"); *Gary v. United States,* 955 A.2d 152, 155 (D.C.2008) ("[T]o prove the defendant's fraudulent design, there must be evidence that the defendant impersonated a police officer to deceive another in order to gain some advantage thereby.").

4. The possibility that appellant's parking of his vehicle in front of the hydrant may have been nothing "more sinister than ignorance of or indifference to the District's parking laws," *ante* 365, did not negate probable cause, because the parking infraction might also have been a deliberate act that appellant thought would not cause police to issue a citation, given that his vehicle looked like a police vehicle. "The test [for probable cause] is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior." *Sennett v. United States,* 667 F.3d 531, 536 (4th Cir. 2012) (internal quotation marks omitted).

police vehicle." On closer inspection, the officers also saw that the car had a siren, a "police radio type box," and "little strobe lights" "right in front of the [vehicle] headlights" like those used on police vehicles.

Appellant parked his vehicle in front of a fire hydrant, exited the vehicle, and then walked up to a house. Detective Delpo observed that appellant was wearing dress slacks, a button-down shirt, and gloves that were the same "style that police officers would wear." The detective's check of the WALES (Washington Area Law Enforcement System) database revealed, however, that the car belonged to a private citizen "who's just 25 years of age." This information made the detective "more suspicious of ... why does this vehicle have all this police equipment on it and a police dash light."

As appellant walked back to his car, a different officer approached appellant and asked him whether he was a police officer, and appellant replied that he was not. An officer advised appellant that he was illegally parked and that the tint on his vehicle windows appeared to be illegal. One of the officers asked appellant whether he had any guns in the car. He replied that he did not. When asked whether police could search his car, appellant responded that he would "rather [they] didn't," but he gave the officer his car keys to allow him to conduct a tint inspection. When the officer opened the car door, he saw in plain view, in the driver's side door pocket, a so-called ASP baton (hereinafter, "asp baton")—according to Detective Delpo, "something a police officer employs or uses."[5] At that point, the officers arrested appellant for possession of a prohibited weapon (the asp baton) and for impersonating a police officer. Incident to the arrest, officers searched the vehicle and found on the front passenger seat, under a

jacket, a loaded 9mm pistol, additional ammunition, and a set of police handcuffs.

In ruling on appellant's motion to suppress the gun and ammunition, the trial court credited Detective Delpo's account of the officers' encounter with appellant. The court found that appellant's car "look[ed] exactly like" an off-duty or undercover police vehicle with a resembling antenna, strobe light, device for activating a police siren, and a "disk" that could have been used as a police GPS device.

## II.

As we have frequently said, our role in reviewing a trial court's ruling on a motion to suppress is to "ensure that the trial court ha[d] a substantial basis for concluding that no constitutional violation occurred." *Howard v. United States*, 929 A.2d 839, 844–45 (D.C.2007) (internal quotation marked omitted). We must "determine if the denial of the motion to suppress is supportable under any reasonable view of the evidence." *Stanley v. United States*, 6 A.3d 270, 277 (D.C.2010) (internal quotation marks omitted). "It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court." *Alston v. United States*, 518 A.2d 439, 440 n. 2 (D.C.1986); *Purce v. United States*, 482 A.2d 772, 775 n. 6 (D.C.1984).

"[T]he Fourth Amendment inquiry is objective [and] an officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *United States v. Vinton*, 594 F.3d 14, 22 (D.C.Cir. 2010) (internal quotation marks omitted).

## III.

Although police generally are required by the Fourth Amendment to obtain a

---

5. The asp baton was stored in a belt holster.

warrant before conducting a search, the automobile exception allows them to search a vehicle so long as there is "probable cause to believe [the] vehicle contains evidence of criminal activity." *Arizona v. Gant*, 556 U.S. 332, 347, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)).[6] Important for the case at hand, the automobile exception "allows searches for evidence relevant to offenses other than the offense of arrest." *Id.* at 347, 129 S.Ct. 1710. Further, where there is probable cause to believe that an automobile contains contraband, officers' authority to proceed with a search on the basis of the exception is not limited by whether they already have a basis for arresting a recent occupant of the vehicle. *See Carroll v. United States*, 267 U.S. 132, 158–59, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ("The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law."); *cf. Purce v. United States*, 482 A.2d 772, 778 (D.C.1984) (recognizing that probable cause to believe a vehicle contains contraband may precede probable cause to arrest: "Viewing all of these circumstances in combination, as we

must, we hold that the officer had probable cause to believe that the envelope [lying on the vehicle console] contained marijuana.... When he looked inside the envelope and found that it did in fact contain marijuana, he then (at the very latest) had probable cause to arrest appellant for violation of the laws which prohibit its possession." (citation omitted)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Probable cause to search a particular place exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found there." *United States v. Scott*, 987 A.2d 1180, 1191 (D.C.2010) (internal quotation marks omitted). "[S]omething more than a reasonable suspicion is required[,]" *id.;* "[p]erhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer's evidence search is that it raise a fair probability, or a substantial chance, of discovering evidence of criminal activity." *Id.* (internal quotation marks omitted); *see also Gates*, 462 U.S. at 238, 103 S.Ct. 2317

6. *See also California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) ("[T]he pervasive schemes of regulation [of motor vehicles], which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met."); *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ("[A]utomobiles and other conveyances may be searched without a warrant ..., provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize."); *United States v. Scott*, 987 A.2d 1180,

1191 (D.C.2010) (" 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.' " (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996))); *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir.2011) (explaining that *Gant* "did not scrap" the automobile exception, as concluded by "every circuit that has considered the issue to date"); *Johnson v. United States*, 7 A.3d 1030, 1037 n. 11 (D.C. 2010) (noting that the automobile exception rule, "recalled in *Gant*, remains unchanged") (internal quotation marks omitted).

(stating that the test of probable cause is "whether, given all the circumstances ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place"). "[P]robable cause ... 'does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands.'" *Enders v. District of Columbia*, 4 A.3d 457, 471 (D.C.2010) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)); *see also Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (describing probable cause as a "flexible, common-sense standard" that "does not demand any showing that such a belief [that contraband will be found] be correct or more likely true than false"); *Clark v. Astrue*, 602 F.3d 140, 147 (2d Cir.2010) ("[P]roba-ble cause is a lower standard than preponderance of the evidence.") (internal quotation marks omitted).

### IV.

In my view, once officers observed that appellant had numerous items of police paraphernalia both on the outside and the inside of his car, including a typical police weapon (the asp baton) inside the passenger compartment, they had reason to believe that he also possessed and had in his vehicle a firearm and ammunition—i.e., other standard police items that are necessary to complete the outfit—that generally are contraband in the hands of a civilian. I agree with the trial court that it is "logical to conclude" "that somebody who goes out, even if it's not criminal in any way, to buy a car, the antenna, the dashboard light, the strobe light, the ... siren control, and the asp ... would also purchase a weapon...."

In a supplemental brief, appellant argues that the government "did not present any expert police testimony suggesting that a person conducting himself as Mr. Tuckson did would likely possess illicit contraband." Supplemental Reply Brief at 7. That is so, but I believe it is an "'entirely reasonable'"[7] inference, which may be drawn without expert testimony, that a person with an abundance of other police-related paraphernalia on and in his car, including an asp baton, would likely also have a gun (perhaps the most typical police weapon). Objectively, the circumstances in this case furnished the officers with "more than bare suspicion"[8] that appellant's vehicle contained another, typical police weapon.[9] Even on the assumption that appellant lawfully possessed the asp baton, "innocent behavior frequently will provide the basis for a showing of probable cause[.]" *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. 2317. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.; see also Cheolas v. City of Harper Woods*, 467 Fed.Appx. 374, 378

7. *Jefferson v. United States*, 906 A.2d 885, 889 (D.C.2006) (quoting *Maryland v. Pringle*, 540 U.S. 366, 372, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)).

8. *Vinton*, 594 F.3d at 21 (internal quotation marks omitted).

9. *Cf. United States v. Christian*, 187 F.3d 663, 669 (D.C.Circuit 1999) ("[T]he presence of one weapon may justifiably arouse concern that there may be more in the vicinity[.]"); *Purce*, 482 A.2d at 778 (holding that although this court has held that the "'mere existence'" of such a manila envelope cannot create probable cause to believe that it contains illegal drugs "'merely because it is frequently used for that purpose,'" where police found a "package of cigarette papers in close proximity to the envelope," the "combination of the envelope and the cigarette papers, lying on the console only inches apart, made it reasonable for the officer to believe that the envelope contained marijuana" and established probable cause).

(6th Cir.2012) ("Probable cause is a 'reasonable grounds for belief, supported by less than prima facie proof [of criminal activity] but more than mere suspicion.'") (quoting *United States v. McClain*, 444 F.3d 556, 562 (6th Cir.2005)) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.1993) (en banc)). Thus, it is of no moment that "none of the visible items in appellant's car (other than the tint on the windows) was illegal for a civilian to possess," *ante*, 366, and that the officers had not seen any contraband" before they searched appellant's vehicle.

But it is not appropriate to minimize the fact of the illegally tinted windows, as the majority opinion does. The officers' observation that appellant was driving a vehicle with unlawfully tinted windows and parked his vehicle in front of a fire hydrant gave them reason to believe that appellant did not always restrain his conduct so as to avoid breaking the law, and thus a reasonable basis for believing that the illegality of carrying a firearm would not deter him from completing his police outfit by possessing contraband. Moreover, the fair probability of appellant's having a gun and ammunition in his vehicle was bolstered by the fact, testified to by Detective Delpo, that the encounter with appellant was in a high-violence area where police had made many arrests for firearm possession. That there might have been what appellant calls "plausible noncriminal explanations" for his possession of the asp baton and all of the other police paraphernalia on and in

his vehicle—appellant suggests "a desire to project an image consistent with [his] aesthetic tastes or simply for recreational purposes"—did nothing to diminish the existence of probable cause, because, again, "the existence of probable cause does not depend on the elimination of all innocent explanations for a situation." [10]

The majority opinion denigrates my conclusion that the officers had probable cause to believe that appellant's car contained an illegal firearm as a "generalization that any person whose car is lawfully equipped … with police-type equipment, is likely to also carry gun [plural] or evidence of fraudulent intent." *Ante*, 366. I make no such generalization. What I maintain is "beyond serious debate"[11] is that officers had probable cause to believe that this appellant—whose vehicle was outfitted like a police vehicle, had *illegally* tinted windows, and had a police baton in its door pocket, who parked the vehicle in front of a fire hydrant, and whom police encountered in a high-violence area[12]— also had an illegal firearm in his car, because a firearm (like the handcuffs the officers also found in appellant's vehicle) is part of standard police garb.

The facts surrounding the search in this case are not in dispute. Regardless of what subjective motivations the officers cited or might have had for the search for appellant's vehicle,[13] and despite appellant's denial that he had a gun in the car, the officers had probable cause to believe that appellant's vehicle contained a firearm

---

**10.** *United States v. Jackson*, 415 F.3d 88, 94 (D.C.Cir.2005).

**11.** *Rose v. United States*, 629 A.2d 526, 537 (D.C.1993).

**12.** This was not, as posited by one of the questions at oral argument, Halloween in Georgetown.

**13.** *See Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that an officer's subjective motivations for a search do not invalidate an otherwise objectively justified search); *see also United States v. Lyons*, 687 F.3d 754, 770 (6th Cir.2012) ("The automobile exception applies even in nonexigent circumstances and even when the officer's decision to stop the vehicle was pretextual.").

(and ammunition), and the search therefore was justified by the automobile exception.[14]

## V.

We may affirm the trial court's denial of the motion to suppress "on any valid ground supported by the record"[15] so long as "there has been no procedural unfairness."[16] Appellant argues that we should not affirm on the basis of the automobile exception since (he asserts) the government did not assert this rationale for the search either in the trial court or in its brief on appeal. That assertion is not quite correct. Although, in its written opposition to appellant's motion to suppress, the government did not use the phrase "automobile exception," the government did quote the portion of *Gant* that discusses the exception: "If there is probable cause to believe a vehicle contains evidence of criminal activity, [*Ross*] authorizes a search of any area of the vehicle in which the evidence might be found." Government's Opposition at 9 (quoting *Gant*, 556 U.S. at 347, 129 S.Ct. 1710). **[R. 15]** The government also cited settled law that a "warrantless search of a motor vehicle parked in a public place is permissible, with or without exigent circumstances, provided the searching authorities have probable cause to believe the vehicle contains contraband." Government Opposition at 10 (quoting *United States v. Wider*, 951 F.2d 1283, 1286 (D.C.Cir.1991)).

The government's initial brief on appeal did not specifically mention the automobile exception, but it did argue that the officers "could reasonably check ... [appellant's] vehicle for additional weapons, even if he lawfully possessed the asp," and it cited the trial court's reasoning that "it's logical to assume that if one who has engaged in all of the conduct that [appellant] engaged in ... there might be other evidence ..., such as another weapon or handcuffs or police badges or other things like that that would be found in the car." The government's brief also summarized the prosecutor's argument that "[o]nce the officers discovered the asp," having already noted the "vehicle's appearance" (i.e., its features making it resemble a police vehicle), "the officers had probable cause to search the vehicle for additional weapons." Thus, "[d]espite [the government's] failure to style [its] claim under ... the specific [automobile exception]," the reasoning it cited "aligns with ... jurisprudence concerning [that exception]." *Euceda v. United States*, 66 A.3d 994, 1006 (D.C.2013). In short, appellant's assertion that there has been no "prior articulation of the argument by the government" overstates the case.

---

14. At least one court has similarly held that where officers find police-related equipment in a private vehicle, they have probable cause to search for other police-related paraphernalia (that would be contraband when possessed by a civilian). *See United States v. Reis*, 906 F.2d 284, 286–87, 291 (7th Cir.1990) (applying the automobile exception and reasoning that "probable cause to search the car existed, based on the detective's observation of the fireball ["a rotating red light of the sort used by police officers"] and other police-related paraphernalia in the car," including "a billy club with a side handle sticking out from between the seats and, in a holder on the door, a black 'mag' flashlight of a type typically used by police officers").

The *Reis* court also found that police officers had probable cause to arrest Reis for impersonating a police officer. However, nothing in the Seventh Circuit's opinion suggests that an automobile-exception search would not have been justified absent probable cause to arrest Reis for that offense.

15. *Barnhardt v. United States*, 954 A.2d 973, 977 n. 3 (D.C.2008).

16. *Randolph v. United States*, 882 A.2d 210, 218 (D.C.2005).

Further, to the extent that anyone would premise an argument against our reliance on the automobile exception on concern about unfair surprise, review of the record would erase any such concern. When the prosecutor made the statement to which the government's brief refers in the passage discussed above ("[O]nce [officers] find that asp, they've got probable cause to believe that the vehicle contains [other weapons]."), appellant's trial counsel responded that the evidence that appellant had a police radio and asp baton provided "nothing to indicate that there's more evidence in the car" and "no indication there are going to be more batons." The court responded:

> I don't think one would necessarily conclude at that point that he is likely to have another asp in the car[,] but [it] might be a logical conclusion, given everything else that is known at that point, that there would be a gun or something else that police officers would keep.

This retort by the trial court clearly was a prompt to appellant to set forth and develop his arguments about why the discovery of the asp in the car did not establish a basis for a reasonable belief that appellant's vehicle would also contain a gun. The court repeatedly pressed the point:

> [W]e're talking about a certain level of logic here that somebody who is driving a car that looks quite like a police vehicle, has antennas that are used in a police vehicle, has this other item on the back that at least according to Officer Delpo is [a] device[ ] . . . used by police. Has a device under the dashboard of the car that operates a siren, has strobe lights, has an asp which police officers carry, and is at least dressed consistently with the garb of officers. Why isn't it a logical conclusion from that that somebody doing all of those things would be far more inclined to be possessing a gun[?]

> . . . .

> [T]hat would not lead you logically to conclude that somebody who would do everything short of [using his police officer-like appearance to take advantage of someone else] would be more likely to have a gun?

> . . . .

> And you're saying it would be illogical to conclude . . . that he would be . . . likely to carry a gun . . . ? [Y]ou're saying that it's illogical for them to conclude that having somebody who's done all these other things ["acquisition of the radio . . . acquisition of the siren device . . . acquisition of the strobe light . . . acquisition of the car, the antennas"] is more likely to have . . . possessed a gun . . . ?

> . . . .

> I also just think that as a matter of just logical relevance, that somebody who goes out, even if it's not criminal in any way, to buy a car, the antenna, the dashboard light, the strobe light, . . . the siren control, and the asp, . . . it's logical to conclude that somebody like that would also purchase a weapon and handcuffs.

Similarly, in explaining its decision to deny the motion to suppress, the trial court reasoned as follows:

> I think it's logical to assume that if one who has engaged in all of the conduct that Mr. Tuckson engaged in, by that I mean all of the acquisition of all these various items that duplicate police vehicles, and then finding an asp, I think it's logical to assume that there might be other evidence of that illegal use, such as another weapon or handcuffs or other things like that that would be found in the car.

> . . . .

[I]t was very logical to assume that somebody—that [had] all of these devices that are consistent with misrepresentation of a police officer and then had an asp, a weapon, used by police to subdue people on the streets, would also have other weapons and other matters, such as badges and so forth....

These various remarks by the trial court repeatedly apprised appellant of the court's reasoning that it was logical for the officers to believe that because his vehicle displayed and contained police paraphernalia, including an asp baton, it was likely also to contain "another weapon," such as a firearm. While none of court's remarks was made in the context of a discussion of the automobile exception, the remarks squarely invited appellant to address the very issue presented here: whether the facts known to the officers gave them reason to believe that a gun would be found in appellant's car.

In addition, this court gave the parties an opportunity to file supplemental briefs on the applicability of the automobile exception, and appellant submitted a supplemental brief and a supplemental reply brief. Thus, appellant was "afforded the opportunity to make an appropriate record in the trial court," had reason to anticipate the argument as raised in the course of this appeal, and has had "a reasonable opportunity to be heard with respect to the reasoning on which the proposed affirmance is to be based." *Randolph*, 882 A.2d at 218. Therefore, there would be no procedural unfairness in deciding the appeal on the basis of the automobile exception.

## VI.

Finally, I explain why I do not agree with appellant that affirming the trial court's denial of the motion to suppress on the basis of the automobile exception would be inconsistent with judicial neutrality or with separation of powers, or that this court must hold "all litigants, including the government, ... to the arguments formulated by their counsel."

I acknowledge that a "basic principle of [our] appellate jurisprudence" is that points not urged on appeal generally are deemed to be waived. *Rose v. United States*, 629 A.2d 526, 535 (D.C.1993) (italics added). That rule is not absolute, however. *See id.* at 537 ("This is not to say an appellate court is absolutely precluded from reaching an issue *sua sponte;* it is not.") and at 538 ("[T]here may be occasions when an appellate court should ... rais[e] *sua sponte* an argument on appeal that the government has failed to raise."). Here, because the trial court effectively raised and relied on the automobile exception (albeit not by name), this case presents an "occasion[ ] when [we as] an appellate court should ... rais[e] *sua sponte* an argument on appeal that the government has failed [squarely] to raise." *Id.* at 538.

To do so is not inconsistent with neutrality or with separation of powers. "[T]he public is entitled to have valid judgments of conviction sustained," and thus part of this court's role is "to act as an institutional failsafe to make sure that the government has not compromised its prosecutorial responsibility." *Id.* at 534, 537; *see also Stewart v. United States*, 37 A.3d 870, 878 (D.C.2012) (declining to reverse the motions judge's decision, "which we believe to be fundamentally correct, on the basis of a government concession which, in our view, rests on a mistaken analysis of the issue before us"). Notably, we take on a similar role when defense counsel asserts an inability to find a non-frivolous issue to raise on appeal. In such cases, we "review counsel's memorandum but make our own, independent examination of the record before affirming (or reversing) the convic-

tion." *Rose*, 629 A.2d at 533–34 (citing *Anders v. California*, 386. U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)).

As this court emphasized in *Randolph v. United States*, 882 A.2d 210 (D.C.2005), "there is no double standard, nor can one be tolerated" with respect to whether we will resolve an appeal on the basis of an issue we have raised *sua sponte*. *Id.* at 226. Our case law amply demonstrates that we have resolved issues in criminal appeals on bases raised *sua sponte* by the court not only when the result favors the government, but also when the result favors the appellant. In *Ferrell v. United States*, 990 A.2d 1015 (D.C.2010), for example, where the appellant's initial brief focused only on the sufficiency of the evidence, we directed the parties to submit supplemental briefs addressing the impact of Super. Ct.Crim. R. 48(a)(1) on the resolution of the appeal. *Id.* at 1018. In resolving the appeal, we saw no need to discuss the sufficiency-of-the-evidence issue raised by appellant; we held instead that the trial court's "failure to correct the prosecutor's misapprehension that the government required leave of court to dismiss the case[,] as the prosecutor told the court he wanted to do before the court declared a recess in the trial ... was plain error" in light of Rule 48(a)(1), and we therefore reversed the conviction. *Id.* at 1016–17, 1022–23. In *Walker v. United States*, 982 A.2d 723 (D.C.2009), in which only appellant Boyd argued that only two (instead of all four of his) kidnapping convictions

could stand, we remanded for the trial court to vacate two of Boyd's convictions and did "the same [as] to appellant Walker (even though only Boyd raised this issue[ ])." *Id.* at 742. In *Martin v. United States*, 952 A.2d 181 (D.C.2008), we reversed the defendant's conviction upon concluding that the search in dispute followed an unlawful warrantless entry even though we "agree[d] with the government that ... appellate counsel failed to argue that the entry itself constituted an unlawful search either in his principal brief or at oral argument" and "even conceded that he was not making an unlawful entry claim at oral argument." *Id.* at 189. We reasoned that with both parties having had an opportunity to brief the issue in supplemental briefs, it was "appropriate for us to decide the issue." *Id.* (citing *Outlaw v. United States*, 632 A.2d 408, 410, 410 n. 7 (D.C.1993) (reversing a conviction based on an argument first raised by this court at oral argument, but after this court invited supplemental briefing)).[17] And, "no matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision." *Randolph*, 882 A.2d at 226.[18]

The bottom line is that, to exercise our *de novo* standard of review, when we review denials of motions to suppress brought on the ground that the search or seizure was unreasonable, we must con-

---

**17.** *See also, e.g., Watkins v. United States*, 846 A.2d 293, 296 (D.C.2004) (allowing post-argument briefing to permit defense counsel to address an issue the opening brief had addressed only in a conclusory footnote, and rejecting the government's argument that the claim had been waived).

**18.** In *Randolph*, the government was the beneficiary of our willingness to consider an issue not argued on appeal: we reached the issue

of whether the trial court error was harmless notwithstanding the government's failure to claim harmlessness. *See Randolph*, 882 A.2d at 223 (stating that where "the government has failed to claim in timely fashion that erroneous admission of hearsay evidence was harmless in the traditional sense, we should apply the harmless error doctrine only when harmlessness is obvious").

duct an independent review of whether a Fourth Amendment violation occurred. While the argument of counsel are "most certainly a valuable aid to the court in the decision-making process," this court's task is to "consider[ ] the briefs and the oral argument, and [to] test[ ] them against the record and the law." *Watson v. United States*, 536 A.2d 1056, 1068 (D.C.1987) (en banc). "[I]n the final analysis the court must satisfy itself ... on the decision to reach, with the reasons supporting it." *Id.* I agree with courts that have recognized that "[i]t is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be 'diluted by counsel's oversights....' " [19]

Finally, affirming the trial court's denial of the motion to suppress by relying on the automobile exception would be consistent with the principle that we " 'do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the

parties before them[.]' " *Randolph*, 882 A.2d at 223 (quoting *Rose*, 629 A.2d at 536–37). That is because we would remain focused on the question the parties have put before us: whether the trial court had a substantial basis for concluding that no constitutional violation occurred and for denying the motion to suppress.

\* \* \*

To require more for probable cause than the undisputed facts of this case provide "would be to ... impose a drastically more rigorous definition of probable cause than the security of our citizens[ ] demands." *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. 2317. For all the reasons discussed above, I would affirm the denial of the motion to suppress and the judgment of conviction.

---

**19.** *State v. Williams*, 525 N.W.2d 538, 544 (Minn.1994) (quoting Albert Tate, Jr., *Sua Sponte Consideration on Appeal*, 9 Trial Judges J. 68 (1968), *in* Appellate Judicial Opinions 128 (Robert A. Leflar ed., 1974)); *see also United States Nat'l Bank v. Independent Ins. Agents of Am.*, 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("[W]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law") (quoting *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)); *United States v. Harrison*, 204 F.3d 236, 240 (D.C.Cir. 2000) (reaching an issue because "it is squarely presented by this case and was relied upon by the trial court," and explaining that "we do not deem it unfair to the appellant to rely on this unargued theory. The arguments made by the government, while not squarely addressing the [theory], fairly noticed the application of the theory, and the authorities cited by the two parties clearly evidence an awareness of it."); *United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir.1997) ("We join several other circuit courts of appeals in holding that appellate courts have the discretion on direct appeal to overlook the government's failure to argue that the admission of the challenged evidence, if error, was harmless, and that appellate courts may therefore consider the issue of harmlessness sua sponte.") (collecting cases); *United States v. Pryce*, 938 F.2d 1343, 1348 (D.C.Cir.1991) ("Only if one adopts an absolutist approach to the adversary system can one contend that courts must never address unargued issues, no matter how obvious their proper resolution may be. Certainly the Supreme Court rejects such an approach."); *Estate of Girard v. Laird*, 159 Vt. 508, 621 A.2d 1265, 1268 (1993) (citing the Tate article in explaining why the court may "reach[ ] results for reasons different than those argued by the parties"); *State v. Weber*, 163 Wis.2d 116, 471 N.W.2d 187, 199 n. 7, 200 (1991) (citing the Tate article in justifying its decision upholding the reasonableness of a search under the Fourth Amendment on grounds that, according to the dissenting justice, the State "was aware of ... but did not argue ... in this court").